561 So.2d 692 (1990)
STATE of Louisiana
v.
Albert Ronnie BURRELL.
No. 88-KA-0697.
Supreme Court of Louisiana.
April 6, 1990.
Rehearing Denied May 24, 1990.
*696 William J. Guste, Jr., Atty. Gen., Tommy J. Adkins, Dist. Atty., Joseph Cusimano, Jr., Asst. Dist. Atty., for plaintiff-appellee.
Bobbie L. Culpepper, Culpepper, Teat, Caldwell & Avery, Jonesboro, for defendant-appellant.
DIXON, Chief Justice.
Ronnie Burrell appeals from his conviction and death sentence for first degree murder.
William Delton Frost and Callie Maude Frost were murdered on the night of August 31, 1986, in their home near Downsville in Union Parish. Mr. Frost was sixty-five. His body was found lying on the floor near the front door of the house. Mrs. Frost, fifty-six years old, was an invalid. She was found seated in a chair. Each of the victims was killed by a single shot to the head from a .22 caliber weapon, probably a rifle. The shots were apparently fired through a window from outside the house. Robbery seems to have been the motive for the killings. There was testimony at trial that the Frosts kept no bank accounts and preferred to keep their money in their house, possibly in a suitcase under their bed. The suitcase was missing from the house after the murder. The Frosts had only a small income, but had received payment of $650 on an insurance claim on August 20, 1986. They had also cashed two social security checks for a total of $504 just two days prior to the murders.
On October 12, 1986, Janet Burrell, Ronnie Burrell's former wife, came forward with information incriminating defendant. Janet Burrell is currently married to James Burrell, defendant's brother. Janet and defendant had a son from their marriage. Defendant had custody of the child. Janet *697 reported to the Union Parish Sheriff's Office that she met with defendant twice on the night of August 31 in order to discuss whether she could have their son for a weekend. According to Janet Burrell's description, she and Ronnie arranged to meet at a designated spot at the side of a road. At the first meeting around 8:00 p.m., defendant said that he could not stay and asked Janet to come back at 11:00 p.m. When defendant arrived for the later meeting at a few minutes past eleven o'clock, Janet sat down in the front passenger seat of defendant's car. She moved some clothes which were in her way and discovered a wallet. The wallet contained a drivers license and social security card, each bearing the name of William D. Frost. Janet asked Ronnie about the wallet, and Ronnie eventually told her he had taken the wallet from the Frosts' house. Defendant said he had gone to the Frosts' house, shot through their window, and had seen Delton Frost lying in a puddle of blood near the front door of the house. Ronnie then showed Janet twenty-seven $100 bills. Janet also saw a rifle in the back seat of the car. A wallet containing Mr. Frost's drivers license and social security card was found in the bedroom of the Frosts' home during the investigation of the killings. There was testimony indicating that the wallet might have been returned to the crime scene after defendant met with Janet.
The investigation of Ronnie Burrell implicated Michael Graham in the killings. The two men were seen together on the night of August 31, both before and after the time when the murders apparently took place. Late on that night, Burrell and Graham were seen at the home of the St. Clair family, where Graham was staying. The men had a brown suitcase and were counting stacks of money. Michael Graham had blood on his arms and shirt. Graham explained the blood by saying he and defendant had fought with some "hippies" at the truckstop.
A few days after the murders, Michael Graham and Kenneth St. Clair were arrested and imprisoned on several counts of forgery. Approximately two weeks after Janet Burrell came forward with her information one of Michael Graham's fellow prisoners, Olan Wayne Brantley, reported inculpatory statements made to him by Michael Graham. Brantley informed the sheriff's office that Graham had told him that Graham and Burrell had killed and robbed the Frosts.
Ronnie Burrell and Michael Graham were arrested and tried separately on the charge of first degree murder. In May of 1987, Michael Graham was found guilty and the jury recommended a sentence of death. After Graham's conviction, Olan Brantley again came forward with information. Brantley reported a conversation he had on July 26, 1987 with Ronnie Burrell, who was in prison awaiting trial. According to Brantley, Ronnie Burrell approached him in order to ask a favor. Defendant admitted that he and Graham committed "the murder." Defendant then asked if Brantley would contact the district attorney's office and attempt to make a deal on defendant's behalf.
A jury found Ronnie Burrell guilty of first degree murder on August 17, 1987; on the same day the jury recommended a sentence of death. Defendant filed a motion for post verdict judgment of acquittal, new trial or arrest of judgment. The motion was denied, and defendant was sentenced to death on December 21, 1987. While his appeal to this court was pending, a motion to remand the case to the trial court was granted in order to allow defendant to file a second motion for new trial. The remand was based on evidence that Janet Burrell had recanted her trial testimony. At the hearing on the second motion for a new trial, Janet Burrell reaffirmed her trial testimony. She stated that her out of court recantations were the result of coercion by a friend of the defendant. The motion for a new trial was therefore denied by the trial court. Defendant presents fifty assignments of error challenging his conviction and sentence.
Assignments of Error Nos. 37, 39 and 40
Defendant argues that his indictment fails to charge an offense punishable under *698 a valid statute, is duplicitous, and contains a misjoinder of offenses. C.Cr.P. 532(1), (3). Defendant raised these objections prior to trial in a motion to quash. Defendant again attacked the indictment in his motion for post verdict judgment of acquittal, new trial or arrest of judgment. An indictment naming both Ronnie Burrell and Michael Graham was filed on October 24, 1986. A severed indictment naming only Ronnie Burrell was filed December 11, 1986. Except for the names of the persons charged, the original and severed indictments are identical in content. The alleged defect in the indictment is that it charges defendant with the commission of several crimes other than first degree murder. The indictment is in substantially the form allowed by C.Cr.P. 462. Only one offense is charged. The grand jury charged that defendant "committed the offense of FIRST DEGREE MURDER WITH A FIREARM." The indictment then gives a more detailed description of the nature of the offense charged. The description states other crimes allegedly committed by defendant in connection with the murder. In addition to first degree murder, the indictment states that defendant committed aggravated battery, armed robbery, simple robbery and theft of over $500. The indictment also lists statutory citations for the definitions of these crimes and for related provisions.
Defendant had a constitutional right to be informed of the nature and cause of the prosecution against him. La. Const. art. I, § 13. His indictment was defective if it did not meet this basic constitutional requirement. State v. Dozier, 258 La. 323, 246 So.2d 187 (1971). The indictment at issue satisfied the constitutional standard by giving defendant notice that he had been charged with first degree murder of William D. Frost and Callie M. Frost. The references to other crimes could not reasonably have misled defendant with respect to the nature and cause of the prosecution against him. The indictment also conforms to statutory requirements. C.Cr.P. 462 allows that the particulars of an offense may be added with a view to avoiding the necessity for a bill of particulars. The references to other crimes in this indictment give additional information on the manner in which the charged offense was alleged to have been committed. This additional information might otherwise have been provided in a bill of particulars.
Assignment of Error No. 31
Defendant argues that the trial court erred in refusing to grant his motion for change of venue. Defendant claims that extensive press coverage of Michael Graham's trial, combined with the notoriety of the case and the outrage of the community, had a cumulative effect that deprived defendant of a fair and impartial trial. State v. Brown, 496 So.2d 261 (La.1986). The burden was on the defendant to prove that a fair and impartial trial could not be obtained in Union Parish. C.Cr.P. 622. Defendant produced twenty-nine newspaper articles in support of his motion for change of venue. Defendant also alleged that the Frosts' murder and the subsequent criminal proceedings had received television and radio coverage, but no evidence was presented to support the allegation. The articles were published outside of Union Parish in the Shreveport Times, the Ruston Daily Leader and the News-Star World of Monroe. The trial court decided that the evidentiary basis for the motion was insufficient because there was no evidence of the extent to which these articles were read by the residents of Union Parish and there was no evidence of other news coverage. The trial court specifically reserved defendant's right to re-urge his motion during voir dire. The motion was not re-urged.
The denial of defendant's motion was reasonable and was not an abuse of discretion. The present case is significantly different from Brown, the case cited by defendant. In Brown, the community had recently been incensed by another murder case in which the defendant received a sentence of life in prison rather than death. 496 So.2d at 262-63. The community was outraged over the perceived leniency of that life sentence. Community outrage was evidenced by approximately two hundred letters written to the local paper. The *699 notoriety of the crime at issue in Brown was shown by the testimony of an expert in the field of public opinion polling who surveyed the community. The newspaper articles were the only evidence presented in support of the motion in the present case. All three of the newspapers named above carried summaries of testimony at the Michael Graham trial and reported Graham's conviction. The newspaper accounts included testimony by Janet Burrell and Olan Wayne Brantley which tended to implicate defendant in the Frosts' murder. The accounts also stated that Ronnie Burrell was Graham's codefendant and would be tried on the same charges at a later date. However, the information on Graham's trial was given in an objective manner which did not tend to incite passion or prejudice among the newspapers' readers. Defendant also did not show any strong public reaction to the Frosts' murder. Two of the newspaper articles describe the reaction of people living in the locality of the Frosts' murder as bewilderment and fear. There is no indication that the community was incited to seek vengeance or retribution. Even assuming that the articles contained information which could cause prejudice against the defendant, the trial court was given no evidence on which to judge the extent to which that information had permeated the community. The trial court did not abuse its discretion in finding that defendant failed to prove he could not obtain a fair and impartial trial in Union Parish.
Assignments of Error Nos. 36 and 48
Defendant argues that the state did not give him pretrial notice of every aggravating circumstance upon which it intended to rely in seeking the death penalty. A defendant is entitled in a capital sentencing proceeding, no less than in the guilt phase of the trial, to be informed of the nature and cause of the accusation against him. La. Const. art. I, § 13. A defendant in a capital case has a right to notice of the aggravating circumstances sufficiently in advance of the sentencing proceeding so that reasonable opportunity to prepare will be afforded. State v. Sonnier, 379 So.2d 1336, 1356 (La.1979). Defendant in this case was informed of the aggravating circumstances at a pretrial conference on August 10, 1987. There is no indication in the record that defendant requested notice of the aggravating circumstances prior to that date. At the pretrial conference, defense counsel offered no objection concerning the aggravating circumstances. It cannot be said on these facts that defendant was denied an opportunity to prepare an adequate defense for the sentencing phase of the proceedings.
Assignments of Error Nos. 1, 3, 4, 5, 7, 11, 12, 13, 14, 15, 16, 17 and 19
In these assignments of error, defendant asserts that during the guilt phase of the trial inadmissible testimony was given and the trial court acted improperly in certain instances. No objection was presented at trial to the errors claimed in these assignments. In most cases an error cannot be availed of after verdict unless it was objected to at the time of occurrence. C.Cr.P. 841. Where a death sentence is imposed, however, this court will review all errors, regardless of contemporaneous objection, in order to determine whether the prejudice caused by the errors was sufficient to render the verdict unreliable. State v. Hamilton, 478 So.2d 123, 127 n. 7 (La.1985). In addition, this court will conduct an independent review of the entire record, regardless of contemporaneous objection, to determine whether the death sentence was imposed under the influence of passion, prejudice or any other arbitrary factors. C.Cr.P. 905.9; Sup.Ct. Rule 28; State v. Martin, 550 So.2d 568, 571 (La. 1989); State v. Thomas, 427 So.2d 428, 433 (La.1982) (on rehearing); State v. Sonnier, 379 So.2d 1336, 1370-71 (La.1980) (on rehearing). The capital sentence review later in this opinion discusses the possible contribution of improper factors to the jury's recommendation of a sentence of death. Even though these assigned errors were not objected to at trial, the assignments will be reviewed in order to determine whether any error occurred and whether any error was sufficiently prejudicial to warrant reversal of defendant's conviction or sentence.
*700 Assignments of Error Nos. 1, 15 and 16
Defendant complains that a witness, Deputy Forbess of the Union Parish Sheriff's Office, gave nonresponsive and prejudicial answers to defense counsel's questions on cross-examination. Defendant cites three answers given by Deputy Forbess in response to questioning by defense counsel. When defense counsel asked why defendant's alibi witnesses had not been questioned earlier in the investigation, the deputy said, "Well, first of all someone such as Ronnie Burrell himself would have to give us information as to who was there. We were not allowed to question Mr. Ronnie Burrell after you were appointed counsel." The deputy's answer does not, as suggested by defendant in his first motion for a new trial, constitute a statement by the deputy that the defendant was present when the Frosts were killed. Deputy Forbess was simply pointing out that there were no alibi witnesses to question until someone presented information as to who was with the defendant, wherever he was, on the night of the murders. Defendant also argues that the deputy improperly commented on defendant's constitutional right not to make a statement. Defendant, however, makes no showing of prejudice stemming from the comment. Deputy Forbess' comment on not being able to question defendant was directly responsive to defense counsel's question, and the deputy made no attempt to elaborate or draw negative inferences.
Later the deputy was asked whether the sheriff's office had "closed the file" on the Frosts' murder. Deputy Forbess responded, "We feel like we made two appropriate arrests on the murder. The murder is still under investigation for other possible involvement from other people." Defense counsel then asked whether the investigation of "other people" was the reason why Michael Rogers' .22 pistol was taken to the crime lab for testing. Michael Rogers was the Frosts' nephew and he visited the Frosts on the night of the murder. Deputy Forbess replied, "That and the fact that during the Michael Graham trial the defense attorney tried to raise the issue that we did not have it tested and apparently tried to confuse the jury with a non-relative fact of that nature, so to satisfy the whomever might want to know, we sent the gun to the lab for analysis." In his first motion for a new trial, defendant contended that the deputy's reference to the trial of Michael Graham was sufficiently prejudicial to warrant a new trial. Defendant's argument concerning prejudice caused by reference to the Graham trial is considered and rejected in the discussion of Assignments of Error Nos. 3, 8, 12, 13 and 14.
The basis of defendant's complaint to this court is that the deputy indicated to the jury his own opinion that defendant was the person who murdered the Frosts. The deputy's opinion on this issue was directly solicited by defense counsel. During cross-examination, defense counsel asked, "And you're sure you have the right man?" Deputy Forbess answered, "I feel like we do, yes, sir." Under these circumstances, the deputy's statement of his opinion as to defendant's guilt was responsive to defense counsel's line of questioning and was not unfairly prejudicial to defendant.
Assignments of Error Nos. 3, 8, 12, 13 and 14
Defendant argues that he is entitled to a new trial because the state placed emphasis on the trial of Michael Graham and because references were made to other crimes committed by defendant and Michael Graham. Defendant claims that references to the Graham trial led the jury to believe that since Graham had been tried and convicted, then Ronnie Burrell, as codefendant, was guilty as well. The record does not support defendant's contention. The state referred to the Graham trial on a few occasions in questioning witnesses on prior testimony, as a time reference, and other incidental references, but there was no reference to the outcome of the Graham trial. This issue was fully explored at the hearing on defendant's first motion for a new trial. Defense counsel questioned eleven of the twelve jurors from defendant's trial. The eleven jurors were asked whether they were aware of the testimony, verdict and sentence in the Graham trial.
*701 Three of the jurors responded in the negative. The other eight jurors stated that their awareness of the Graham trial did not affect their decision in the trial of Burrell. As a prerequisite for the granting of a motion for a new trial, a defendant must establish that he has suffered some injustice. C.Cr.P. 851. Defendant has failed to show any injustice resulting from the state's reference to the Graham trial.
The testimony concerning other crimes offers even less of a basis for a complaint by defendant. During cross-examination of the defendant at trial, the state asked questions concerning defendant's conviction for other crimes, as allowed under R.S. 15:495. Defendant also claims that Janet Burrell gave testimony at page 150 of the trial transcript (Record VI, p. 1164), concerning other crimes committed by defendant for which defendant was not convicted. The cited page of the transcript contains testimony by Deputy Forbess and not by Janet Burrell. A review of Janet Burrell's testimony reveals no statements supporting defendant's claim. With respect to references to other crimes committed by Michael Graham, the testimony at trial clearly indicated that defendant had no connection with these crimes. There is no reason to believe that Graham's crimes prejudiced the jury against Ronnie Burrell.
Assignment of Error No. 4
Defendant argues that the trial court erred in ruling that one of defense counsel's questions was irrelevant. Olan Wayne Brantley, a convict, testified that both Michael Graham and Ronnie Burrell admitted to him that they had killed the Frosts. On cross-examination, Brantley acknowledged that, while in prison, he had obtained a photocopy of a newspaper article concerning the Graham trial. Defense counsel asked Brantley who had made the photocopy for him. The prosecutor objected and the trial court ruled that the source of the photocopy was irrelevant. Defendant does not indicate what he hoped to show by revealing the source of the photocopy, and defense counsel made no attempt to argue the issue at trial. The trial court was well within its discretion in finding defense counsel's question to be irrelevant.
Assignment of Error No. 5
Defendant contends that the trial court erred in refusing to allow defense counsel to lay the foundation for the introduction of a prior inconsistent statement by James Burrell. James Burrell is defendant's brother and is the husband of defendant's former wife, Janet Burrell. He was called as a witness by defendant. James testified that on the night of the murder, he and Janet were visiting Janet's grandmother in Sibley. Janet testified that her meetings with defendant took place at a site near Sibley. Defense counsel asked James Burrell whether he remembered telling two private investigators that on the night of the murder he was in Arcadia, Louisiana. The trial court sustained the state's objection that defense counsel was improperly attempting to impeach his own witness.
The trial court ruling was correct. At the time of trial, under R.S. 15:487 a party could not impeach his own witness unless he was taken by surprise by the testimony of the witness or unless the witness showed hostility. Defense counsel made no attempt to establish either surprise or hostility with respect to James Burrell's testimony. The trial court properly found that defense counsel had not shown the necessary foundation in order to impeach his own witness. The trial court did not rule that defense counsel could not ask further questions or otherwise attempt to lay a foundation for impeachment.
Assignment of Error No. 7
Defendant argues that the trial court erred in refusing to allow Janice Evans to testify as to the reputation of Janet Burrell. Defense counsel asked Ms. Evans whether she knew Janet Burrell's reputation in the neighborhood or community. After an affirmative response, defense counsel asked, "Is that reputation good or bad?" The trial court sustained an objection to this question and indicated to defense counsel that he had not laid a proper foundation for evidence of Janet Burrell's *702 reputation for truth or veracity. Rather than attempting to lay a proper foundation, defense counsel said he needed some material which was in his car and proceeded with his next witness without any further questioning of Ms. Evans. The trial court committed no error. At the time of the trial, R.S. 15:491 provided that the credibility of a witness could be attacked by showing that the general reputation of the witness for truth or for moral character was bad. Defense counsel failed to limit his questions to reputation for truth or moral character. The trial court properly ruled that the questions were too general.
Assignments of Error Nos. 10 and 11
Defendant argues that the trial judge acted improperly on two occasions. First, defendant claims the judge erred in giving the following instruction to the jury:
"It appears that the State contends that the defendant killed William D. Frost and Callie M. Frost with the specific intent to kill or inflict great bodily harm and was engaged in the perpetration or attempted perpetration of armed robber (sic), simple robbery or aggravated burglary or that the defendant killed William D. Frost and Callie M. Frost and that he had the specific intent to kill or inflict great bodily harm upon more than one person."
Defendant maintains that the above instruction indicated to the jury that the defendant was guilty and constituted an improper commentary by the trial judge on the facts of the case. C.Cr.P. 772, 806. Defendant is mistaken. The trial court was merely stating the elements of the crime for which the defendant was being tried. The court did not offer any opinion as to what facts had been shown by the state or as to the guilt of the accused. The trial court's instruction was proper.
Second, defendant asserts that the trial judge erred by personally questioning one of the witnesses. James Bearden was the witness questioned by the judge. Mr. Bearden was describing his visit to the Frosts' house on the evening of the murder. The judge asked a few questions to clarify the lighting conditions and asked whether the witness had entered the Frosts' house. A trial judge may examine a witness in order to bring out needed facts not elicited by the parties. State v. Gordy, 380 So.2d 1347 (La.1980). The judge must be cautious in his questioning so as not to impliedly comment on the facts. C.Cr.P. 772; State v. Williams, 375 So.2d 1379 (La.1979). In this case, the trial judge sought useful information in an impartial manner without impliedly commenting on the facts.
Assignment of Error No. 17
Defendant claims that the state elicited irrelevant and prejudicial testimony from Deputy Forbess. Deputy Forbess gave testimony concerning defendant's alibi witnesses. One of the alibi witnesses was James Dugdale. In response to questioning from the state, the deputy affirmed that Mr. Dugdale's daughter, Dolly, was Ronnie Burrell's girlfriend at the time of the murder. The deputy also stated that Dolly Dugdale went to Virginia at some point after defendant's arrest, and she was known to have remained in Virginia until her disappearance the day before the trial began. Defendant argues that the deputy's testimony was prejudicial because it implied that defendant actually committed the murder and that defendant's girlfriend left the state, and later disappeared, in order to avoid contact with defendant.
The relevancy of Dolly Dugdale's whereabouts must be considered in the context of the deputy's entire testimony. The statements complained of occurred during redirect questioning after defense counsel's cross-examination. Defense counsel had placed significant emphasis on asking Deputy Forbess why witnesses potentially helpful to the defense had not been questioned earlier in the investigation or had not been questioned at all. While defense counsel did not specifically mention Dolly Dugdale as a potential witness who had not been questioned, it was within the reasonable scope of the redirect examination for the state to establish that Ms. Dugdale was unavailable for questioning. Even if the deputy's statements were irrelevant, defendant *703 has not shown any substantial prejudice generated by the statements. The state did not comment on the deputy's statements or attempt to draw negative inferences. The implications cited by defendant as to Dolly Dugdale's motive for leaving Louisiana are his own creation and are not the natural implications of the testimony given by Deputy Forbess.
Assignment of Error No. 19
Defendant argues that the trial court erred in allowing the state to call a witness, Paul St. Clair, who had violated the sequestration order. On direct examination, Mr. St. Clair testified to little more than the fact that Ronnie Burrell and Michael Graham were present in the St. Clair house late on the night of August 31, 1986. Mr. St. Clair had been present in court prior to his testimony and had heard similar testimony from two other witnesses.
The trial judge, in his discretion, may determine the disqualification of a witness when a rule of sequestration has been violated. This ruling will generally not be disturbed absent a clear showing of abuse. C.Cr.P. 764; State v. Warren, 437 So.2d 836 (La.1983); State v. Stewart, 387 So.2d 1103 (La.1980). There was no abuse of discretion in this case. The state believed that Paul St. Clair was in Virginia at the time of trial and had not intended to call him as a witness. As soon as the state became aware of Mr. St. Clair's presence in court, he was instructed to remain outside the courtroom until he was called as a witness. There was no fault in the state's conduct with respect to this witness. In addition, Mr. St. Clair was able to give details concerning his memory of the events of August 31, 1986 which indicated that he was testifying from his own knowledge and was not influenced by the testimony of other witnesses.
Assignment of Error No. 6
Defendant argues that the trial court erred by refusing to allow David Lewis to testify as an expert witness with respect to the reconstruction, investigation and preservation of the crime scene. The record does not reveal any ruling by the trial court on the issue of whether Mr. Lewis was qualified to be an expert witness. The trial court ruled that the testimony to be elicited from Mr. Lewis was irrelevant. Defense counsel stated at trial that Mr. Lewis would testify on proper procedures for investigating and preserving a crime scene. The trial court found there was no relevance in testimony concerning the types of evidence which might have been discovered if more careful police procedures had been followed. The issue of the relevancy of possible destruction of evidence is considered in the discussion of Assignments of Error Nos. 34, 35 and 45.
Assignment of Error No. 18
Defendant argues that the trial court erred by refusing to allow a letter to be used to impeach the credibility of Janet Burrell. The letter appeared to be written by Charles Burrell, son of Janet and Ronnie Burrell. Charles Burrell was six years old at the time of trial. The letter sought membership in a record club and contained an order for the purchase of certain items from the club. Defense counsel asserted at trial that he wished to impeach Janet Burrell's credibility by showing that Janet had written the letter in the name of her son in order to perpetrate some sort of fraud on the record club. The trial court noted that the envelope containing the letter bore neither a stamp nor a postmark, indicating the letter had never been mailed. The court sustained the state's objection that the letter was irrelevant. Even assuming that the letter was evidence of a dishonest act by Janet Burrell, the trial court was correct in finding the letter was irrelevant for purposes of attacking Janet's general credibility. Under R.S. 15:491, defense counsel was entitled to attack Janet's general credibility only by inquiry into her general reputation and not by evidence of particular acts. The letter was evidence of a particular act and was properly excluded.
Assignment of Error No. 20
Defendant argues that the trial court erred in allowing Olan Wayne Brantley to give expert opinion testimony regarding *704 his medication. R.S. 15:464. Brantley testified that he was taking lithium carbonate in order to control mood swings and that he had received test results on the day of his testimony which stated his lithium levels were in the therapeutic range. Defendant contends that by allowing Brantley to give this testimony, the court caused the jury to believe that Brantley was a reliable witness who was telling the truth in all respects of his testimony. The trial court did not in any way endorse Brantley's testimony as being truthful. In overruling defense counsel's objection to the testimony, the trial court merely acknowledged that the witness had personal knowledge of what medication he was taking and the reason the medication had been prescribed. The court was correct in finding that Brantley was not giving expert opinion testimony.
Assignment of Error No. 9
Defendant argues that the trial court erred during closing arguments in refusing to allow defense counsel to comment upon Deputy Forbess' testimony that a footprint found at the crime scene had not been preserved. Defense counsel should be allowed a wide latitude in closing argument, and any undue restriction which limits argument to the prejudice of the defense is error. Where the prejudice is substantial reversal is warranted. State v. Joseph, 341 So.2d 861, 867 (La.1977). There was no substantial prejudice to the defendant in the present case. Defense counsel was allowed to comment extensively in his closing argument on the fact that only one footprint was found and on the fact that the state could provide no description of the footprint. Defense counsel was allowed to point out that the identification of the footprint was a piece of evidence missing from the state's case. The lack of preservation of the footprint did not, in itself, tend to show any further weakness in the state's evidence.
Assignment of Error No. 2
Defendant argues that the trial court erred in instructing the jury to disregard defense counsel's comments on the nature of a crime of which a witness had been convicted. Paul St. Clair, a witness for the state, testified on cross-examination that he had been convicted in Texas for unauthorized use of a vehicle. Defense counsel asked if the crime was theft of an automobile. The prosecutor objected and the trial judge gave the instruction of which defendant complains.
The instruction was proper. Defense counsel was attempting to suggest that unauthorized use of a vehicle was the same crime as theft, which is not the case in either Louisiana or Texas. R.S. 14:67, 14:68; Tex. Penal Code Ann. §§ 31.03, 31.07 (Vernon 1989). Contrary to defendant's suggestion, the trial court did not refuse to allow defense counsel to show that the witness had served time for car theft. Defense counsel never attempted to show any such thing. Defense counsel did attempt to misdescribe the crime to which the witness had admitted.
Assignment of Error No. 27
Defendant argues that the trial court erred in refusing to grant his motion for a post verdict judgment of acquittal based on insufficiency of the evidence. C.Cr.P. 821. Defendant claims that the case against him is based entirely on circumstantial evidence and does not satisfy the standard set by R.S. 15:438, which provides: "The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." Contrary to defendant's position, not all of the evidence against him was circumstantial. There was evidence that defendant admitted to Janet Burrell and to Olan Wayne Brantley that he had committed murder. These admissions are direct evidence of the commission of a crime and cannot be considered circumstantial. Defendant's admissions might have been sufficient in themselves to justify the jury's guilty verdict.
Even without consideration of the direct evidence, defendant's arguments concerning circumstantial evidence are without merit. Defendant complains of *705 three specific pieces of evidence. First, Janet Burrell testified that on the evening of the murder she saw defendant driving a blue Chrysler automobile. Defendant points out that he testified that he had sold that car several months before the murder. This apparent conflict in testimony relates to the credibility of Janet Burrell and has nothing to do with creating a reasonable hypothesis of innocence with respect to circumstantial evidence presented by the state. The jury was not unreasonable in believing Janet on this point. Second, Janet Burrell said that on the night of the murder she saw a wallet containing Mr. Frost's drivers license and social security card. Defendant asserts that Janet's testimony conflicts with the fact that a wallet with Mr. Frost's drivers license and social security card was found in the bedroom of the Frosts' house after the murder had been committed. Again, this is an attack on credibility rather than an explanation of the significance of a piece of circumstantial evidence. Again, the jury could reasonably have believed Janet. The wallet could have been returned to the Frosts' house after defendant's meeting with Janet. Janet met with defendant shortly after 11:00 p.m. Another witness, Willie Wilson, stated that he saw a white car at the Frosts' house around 11:00 or 11:30 p.m. The defendant had access to a white Buick station wagon, though he claimed that car was being repaired and could not be driven at the time of the murder.
Third, defendant claims it is a reasonable hypothesis that the white car seen at the Frosts' house belonged to Michael Rogers rather than to defendant. This claim is based on testimony by Grace Cruse which was proffered but not admitted at the hearing on defendant's first motion for a new trial. In her proffer, Grace Cruse said she saw Michael Rogers driving a cream colored car at the Frosts' funeral. Mrs. Cruse testified at trial but she was not questioned concerning any vehicles owned by Rogers. A motion for post verdict judgment of acquittal must be judged according to the sufficiency of the evidence produced at trial. The issue of whether Grace Cruse's testimony was sufficient to warrant a new trial is considered in the discussion of Assignments of Error Nos. 22, 23, 25, 26, 29, 30, 42, 43, 44, 46 and 47.
Assignment of Error No. 28
Defendant argues that the trial court erred in refusing to grant his motion in arrest of judgment. Defendant raises several objections to alleged defects in the proceedings below, all of which are considered and rejected elsewhere in this opinion. A motion in arrest of judgment may be granted only on the grounds specified in C.Cr.P. 859. Defendant raises only one point related to one of the specified grounds. Defendant claims the grand jury indictment was substantially defective. C.Cr.P. 859(1). This claim is addressed under Assignments of Error Nos. 37, 39 and 40.
Assignments of Error Nos. 22, 23, 25, 26, 29, 30, 42, 43, 44, 46 and 47
One of the grounds urged by defendant in his first motion for a new trial was that newly discovered evidence was available. C.Cr.P. 851(3). At the hearing on that motion for a new trial, defense counsel called witnesses and attempted to question them concerning the alleged newly discovered evidence. For each such witness the state objected that the testimony should not be allowed because the evidence sought to be presented could have been discovered before or during trial with the exercise of reasonable diligence by the defendant and his counsel. With respect to some of the evidence, the state noted that the evidence related to issues which had been raised either at the trial or the new trial hearing of Michael Graham. The trial court sustained the state's objections. In denying the defendant's motion for a new trial, the trial court ruled that the defendant had produced no new material evidence which could not have been discovered by the exercise of reasonable diligence prior to or during trial. Defendant now argues that the trial court should have allowed the testimony as to new evidence and granted a new trial because defense counsel cannot be held responsible for being aware of all testimony taken at the Graham trial. Defendant's counsel at trial raised the same issue. *706 The trial court responded that defense counsel had followed the Graham trial, was present during most of the Graham trial, and possessed a large part of the transcript of that trial. The state points out that in its supplemental response to defendant's motion for discovery, it gave defendant the following notice:
"ALL MATTERS disclosed during trial of # 38,734-B, State v. Michael Ray Graham, are made a part of the State's Response by reference to the Record thereof. With the exception of such portions thereof as would be admissible against Graham but not against Burrell, the State may use all such matters in trial hereof."
The state alleges that this notice was given specifically because the state knew that defendant's trial counsel was present at the Graham trial and had a transcript of that trial.
Defendant does not claim that his trial counsel was not present at or did not possess a transcript of the Graham trial. Defendant does suggest that the issue of "reasonable diligence" in discovering evidence should be judged in light of the limited resources available to the defendant as an indigent with a court appointed counsel. State v. Gilmore, 332 So.2d 789 (La.1976). On this point it appears that defendant's counsel on appeal has misapprehended the facts. Defendant had the advice of retained counsel throughout the proceedings below. The court did appoint counsel for Michael Graham. In any case, there is no evidence that defendant's limited resources prevented him from gaining access to a record of the proceedings against Michael Graham. In State v. Gilmore, supra, the case cited by defendant, the discovery of the new evidence offered by the defendant required investigation in order to identify exonerating witnesses. The evidence from the Graham proceedings, on the other hand, was readily available as a matter of public record, and it appears that defendant's trial counsel possessed a copy of the transcript of the Graham trial. Under these circumstances, the trial court was correct in finding that matters raised during the Graham proceedings could not be considered newly discovered evidence for the purpose of granting a new trial.
The state raised the issue of evidence offered during the Graham proceedings with respect to five of defendant's witnesses at the hearing on the first motion for a new trial. The trial court allowed proffers of the testimony of the first three of these witnesses, but did not allow proffers for the other two witnesses. Defendant argues that he should have been allowed to make a proffer for these two witnesses. Because the trial court was correct in not allowing the testimony of these witnesses, the lack of a proffer is of no consequence.
Defendant also argues that the trial court erred in failing to grant a new trial when the trial testimony of Michael Rogers was placed in question by testimony from his parents and Mrs. Grace Cruse at the hearing on the first motion for a new trial. The only testimony by the parents and Mrs. Cruse of any significance was made by proffer. The testimony was not allowed in evidence because it concerned matters which were discoverable prior to or during trial. The testimony in the proffers largely concerns Michael Rogers' whereabouts on the night of the murder. The testimony of Rogers' parents is part of the excluded testimony discussed above. The trial court obviously could not grant a new trial on the basis of testimony which was properly ruled inadmissible. Defense counsel argued at the hearing that any conflict between Rogers' version of events and his parents' version of events could not have been discovered prior to trial because there was no way to know, prior to trial, what testimony Rogers would give at trial. The state responded that Rogers' testimony at the Graham trial had been exactly the same as his testimony at defendant's trial. With respect to Grace Cruse, the state pointed out that Mrs. Cruse was a witness at defendant's trial and so had been available for questioning concerning Rogers' testimony at that trial. The trial court acted properly in excluding the testimony relating to Michael Rogers.
*707 In addition, a review of the proffers by the three witnesses shows that the testimony, even if admitted, would not have been sufficient to warrant a new trial. Defendant apparently intended the testimony to strengthen the possibility that Michael Rogers might have killed the Frosts. Rogers and his girlfriend, Ruth Toney, visited the Frosts on the night of the murder. Rogers testified at trial that he arrived at the Frosts' home around dark and left at about 8:30 or 9:00 that evening. He said he arrived home at his camper, perhaps thirty-five miles from the Frosts' home, at 10:00 or 11:00 o'clock. Rogers was not wearing a watch that evening and could not be sure of the time. The proffered testimony of Rogers' father did not contradict his son. The testimony of Rogers' mother conflicted with that of Rogers on one point. The mother said Rogers came to his parents' house at about 9:00 or 9:30 the evening of the murder, and Rogers then went to his camper. This conflict does not appear to aid defendant's case. If anything, the conflict indicates that Rogers may have left the Frosts' house even earlier than Rogers had indicated in his own testimony. This weakens rather than strengthens defendant's attempt to establish that Rogers was at the Frosts' house at a later time.
Grace Cruse testified that Rogers' mother told her that Rogers had arrived at his parents' house around 12:30 a.m. Cruse claimed Rogers had told his mother that he had left the Frosts' house a little after midnight. This testimony by Cruse was hearsay and for that reason defendant's trial counsel was unsuccessful when he attempted to introduce apparently the same testimony at trial. Defendant suggests that this testimony was not hearsay because it was offered simply to prove that Rogers' mother made the statements and was not offered to prove the truth of the matter asserted. It follows that Cruse's testimony on this point was relevant only for purposes of impeachment of Rogers' mother. Rogers' mother specifically denied making the statements which Mrs. Cruse attributed to her. If the testimony was offered as evidence of a prior inconsistent statement, then defense counsel was attempting to impeach his own witness. The impeachment by the defense of its own witness would not have aided defendant in establishing newly discovered evidence for purposes of a new trial.
The other points raised in Grace Cruse's proffer were that Rogers was driving a cream colored car on the day of the Frosts' funeral and that there were problems between Rogers and the Frosts with respect to a property dispute. The cream colored car is significant because a white car was seen at the Frosts' house shortly before midnight. The property dispute indicates a possible motive for Rogers to kill the Frosts. The trial court must grant a new trial only if, had the evidence been introduced at trial, it would probably have changed the verdict. C.Cr.P. 851(3). The proffered testimony, considered in light of the evidence of defendant's confessions and the other evidence against defendant, was insufficient to cause a reasonable jury to reach a different verdict. The proffered testimony does not show any evidence which would justify a new trial.
Assignments of Error Nos. 34, 35 and 45
Defendant argues that the trial court erred in sustaining the state's objections to certain questions asked by defense counsel at the hearing on the first motion for a new trial. Defendant's arguments concern testimony by Lorraine Opal and Janet Burrell. Lorraine Opal is the grandmother of Amy Opal. Amy Opal testified at trial that on the night of the murder she saw Michael Graham and Ronnie Burrell at the home of the St. Clair's where she was spending the night. She saw Graham and Burrell sitting on a couch and in front of them were two or three stacks of money and a brown suitcase. At some point on that night she also saw blood on Michael Graham. Amy's friend Jackie St. Clair gave essentially the same facts in her testimony. At the hearing, defense counsel asked Amy if she had told her grandmother that she had not been entirely truthful in her testimony at trial. Amy answered, "No, sir." The next witness was Lorraine Opal. Defense counsel *708 attempted to elicit testimony from Mrs. Opal concerning statements Amy might have made about her testimony at trial. The state objected that there was no foundation for allowing such testimony. The court implicitly sustained the objection.
The trial court ruled correctly. At the time of the hearing, R.S. 15:493 provided:
"Whenever the credibility of a witness is to be impeached by proof of any statement made by him contradictory to his testimony, he must first be asked whether he has made such statement, and his attention must be called to the time, place and circumstances, and to the person to whom the alleged statement was made, in order that the witness may have an opportunity of explaining that which is prima facie contradictory."
This rule must not be applied in a mechanical manner which would thwart the fundamental constitutional right to present a defense. La. Const. art. I, § 16. In the present case, however, defense counsel made no attempt to establish the time, place or circumstances of Amy's alleged statement to her grandmother. Counsel did not ask to recall Amy to the stand in order to properly confront her. Cf. State v. Davis, 498 So.2d 723, 726 (La.1986). Defense counsel in fact declared that he was unable to establish the specific context of the alleged statement.
Janet Burrell testified immediately after Lorraine Opal. Defense counsel asked Janet Burrell whether she had visited the crime scene after the murders took place. The state objected that the question was irrelevant. Defense counsel said, "The point of that, Your Honor, that it's our understanding and we've alleged that various people crossed the barricade at the scene and perhaps destroyed or hampered (sic) with the evidence." The trial court sustained the state's objection. The trial judge's determination regarding the relevancy of offered testimony is entitled to great weight and should not be overturned absent a clear abuse of discretion. State v. Caldwell, 504 So.2d 853, 856 (La. 1987); State v. Stramiello, 392 So.2d 425, 428 (La.1980). There was no abuse of discretion in disallowing questions concerning Janet Burrell's possible visit to the crime scene. Defendant alleges that the visit took place approximately two days after the crime. Defendant does not indicate what, if any, physical evidence remained to be destroyed or tampered with two days after the crime. Even if evidence may have been lost as a result of Janet Burrell or others crossing the police barricade, the reason for the nonexistence of such evidence is not clearly relevant to showing that defendant did not commit the crime. The lack of physical evidence connecting defendant to the crime was relevant to the strength or weakness of the prosecution's case, and defense counsel was allowed during his closing argument to comment on the lack of physical evidence. The fact that unauthorized persons may have disturbed potential evidence does not, in itself, tend to show that any such evidence would have tended to exonerate the defendant. There was only a speculative connection between Janet Burrell's alleged visit to the crime scene and any evidence tending to negative the commission of the offense by defendant.
Assignment of Error No. 38
Defendant argues that the trial court erred in failing to grant a new trial on the basis that the form utilized by the jury in recommending the death penalty did not show that the verdict was unanimous. Defendant does not state what effect the verdict form might have had on the jury's recommendation of the death sentence. It will be assumed that defendant contends the jury might have been led to believe that its recommendation did not require a unanimous verdict. The jury form complied with the statutory form of jury recommendation in C.Cr.P. 905.7 as it read at the time of sentencing. The statutory form as it read at that time did not state that the recommendation must be unanimous.
Defendant correctly notes that in considering the effect of a verdict form on the jury's deliberations, the question is whether an improper interpretation of the *709 sentencing process could have been drawn by a reasonable jury from the instructions given by the trial judge and from the verdict form employed. Mills v. Maryland, 486 U.S. 367, 375-76, 108 S.Ct. 1860, 1866, 100 L.Ed.2d 384, 394 (1988). The trial judge in the present case clearly instructed the jury that recommendation of a death sentence must be unanimous. In light of the jury instruction, a reasonable jury could not have concluded that the verdict form allowed the recommendation of a death sentence without the unanimous agreement of the jury. Further, there is no doubt as to the unanimity of the jury in the present case. After the jury returned its recommendation that the defendant be sentenced to death, the jury was polled individually. Each juror stated that the recommendation of a death sentence was his or her own verdict. The trial court properly refused to grant a new trial on the basis of the content of the form of jury recommendation.
Assignments of Error Nos. 24, 49 and 50
Defendant argues that the trial court erred in failing to grant a new trial when Janet Burrell gave testimony at the hearing on the second motion for a new trial which was contrary to the testimony she had given during the trial. At the hearing held on July 6, 1988, Janet Burrell admitted that she had given statements after the trial which were contrary to her testimony at trial. Janet's recantation of her trial testimony was recorded on audio tape on two occasions. The first occasion was at the home of her brother, Richard Evans. The second occasion was in the office of defendant's attorney. While in the attorney's office, Janet answered questions posed by the attorney. Janet later signed a typed transcript of this interview. During the interview with the attorney, Janet stated that she had lied at trial in order to regain custody of Charles Burrell, the child of Janet and defendant. Defendant had custody of the child at the time of his arrest.
After admitting to her out of court recantation, Janet testified at the July 6 hearing that the recantation was made under duress. She said that Dorothy Ambrose, a friend of defendant's mother, threatened her. Mrs. Ambrose told her that "the Welfare" would take Janet's children away from her and that the FBI was going to charge Janet with perjury. Mrs. Ambrose allegedly offered Janet "immunity papers" and money in exchange for Janet changing her testimony in order to exculpate defendant. Janet claimed that while she was at her brother's home, Mrs. Ambrose held a gun on her and forced her to read prepared answers while the recording was being made. Janet also claimed that Mrs. Ambrose was carrying a gun in her purse when she accompanied Janet to the office of defendant's attorney. Janet's version of events was supported by recordings made of two conversations between Janet and Mrs. Ambrose which took place after Janet's recantation. These recordings were made by the Union Parish Sheriff's Office without the knowledge of Mrs. Ambrose.
At the hearing, when defense counsel asked Janet Burrell whether her testimony at the trials of Michael Graham and Ronnie Burrell was true and correct, Janet answered, "Yes, sir, they were true." Janet did not give any testimony at the July 6 hearing which was contrary to her testimony at trial. The trial court was correct in finding that, given the evidence at the hearing, Janet's statements made out of the presence of the court were insufficient to establish the invalidity of her trial testimony.
Defendant also claims that the trial court erred in overruling an objection to the relevancy of Janet Burrell's testimony concerning the coercion of her recantation. On cross-examination, the state asked if Janet had experienced problems with defendant's mother and with Dorothy Ambrose. Defense counsel objected that the question was irrelevant. The trial court overruled the objection on the basis that the question "possibly touches on the reason why she [Janet] might've made the statement she did." The subsequent testimony, as described above, confirms the corrections of the trial court's ruling and shows that Janet's "problems" with defendant's mother and Mrs. Ambrose were crucial *710 to understanding the significance of Janet's recantation. Defendant argues that the alleged threats against Janet Burrell with respect to "the Welfare" and the FBI were irrelevant because Mrs. Ambrose had no connection with either agency, and she could not have enforced such threats. The relevant fact is that the threats were made. The extent to which Janet Burrell was reasonably justified in believing the threats is a matter which goes to the weight of the evidence. The trial court did not err by allowing testimony on the coercion used to obtain Janet Burrell's recantation.
Finally, defendant asserts that even if the testimony at the July 6 hearing did not establish that he is entitled to a new trial as a matter of strict legal right, the trial court should have granted a new trial in order to serve the ends of justice. C.Cr.P. 851(5). Defendant suggests that because there was no visible sign of coercion when Janet Burrell gave her statement in the office of defendant's attorney, Janet's recantation of her trial testimony was significant enough to justify a new trial. Motions for a new trial based on recantations of trial testimony are strongly disfavored, as the recantation amounts to a confession of perjury by the witness. State v. Prudholm, 446 So.2d 729, 736 (La.1984); State v. Clayton, 427 So.2d 827, 832-33 (La.1982) (on rehearing). In view of Janet Burrell's denial of her recantation, there was no justification for a new trial. State v. Spell, 399 So.2d 551, 558 (La.1981).

CAPITAL SENTENCE REVIEW
This court must review every sentence of death to determine if it is excessive. C.Cr.P. 905.9. In determining whether the sentence is excessive, the court will consider whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, whether the evidence supports the jury's finding of a statutory aggravating circumstance, and whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
A. Passion Prejudice and Other Arbitrary Factors
The jury was not influenced by passion, prejudice or any other arbitrary factors. Both defendant and his victims were white. Defendant was represented by a black attorney before a predominantly white jury, but there is no indication that racial prejudice played any role in the jury's decision. The most significant potential arbitrary factor cited by defendant is that the jury may have been influenced by the results of the trial of Michael Graham. The problem caused by the Graham trial is considered in the discussion of Assignments of Error Nos. 3, 8, 12, 13 and 14, and also is considered in the discussion of pretrial publicity in Assignment of Error No. 31. The record shows that the jury was not improperly influenced by the results of the Graham trial either through press reports prior to trial or through references by the state during trial.
Assignments of Error Nos. 21 and 32
Defendant contends that the death penalty was arbitrary in this case because the same circumstances used to establish the homicide as a first degree murder were also used as aggravating circumstances. In order to avoid arbitrary and capricious imposition of the death penalty, an aggravating circumstance used to justify a death penalty "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Zant v. Stephens, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235, 249-250 (1983). The United States Supreme Court has found that the narrowing function required by Zant is satisfied by the specification of circumstances in R.S. 14:30 for differentiating first degree murder from other forms of homicide. Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). In Lowenfield, the defendant's intent to kill or inflict great bodily harm upon more than one person was used both as an element of the crime of first degree murder *711 and as an aggravating circumstance for imposition of the death penalty. The court decided that the narrowing function was performed by the jury at the guilt phase. The court stated, "The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally-required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm." 484 U.S. at 246, 108 S.Ct. at 555, 98 L.Ed.2d at 582-83. The duplication of elements of the crime as aggravating circumstances for purposes of sentencing does not render the sentencing process arbitrary or capricious.
B. Aggravating Circumstances
The jury found that the state had proved the following statutory aggravating circumstances: (1) the offender was engaged in the perpetration or attempted perpetration of aggravated burglary; (2) the offender was engaged in the perpetration or attempted perpetration of armed robbery; (3) the offender was engaged in the perpetration or attempted perpetration of simple robbery; (4) the offender knowingly created a risk of death or great bodily harm to more than one person. C.Cr.P. 905.4. The evidence supports all four of the jury's findings. The evidence showed that defendant either killed the Frosts or participated with Michael Graham in a course of criminal conduct with the active desire that the Frosts be killed. Further, it was shown that the Frosts were killed in order that defendant could gain entry to the Frosts' house and take money or other valuables. These facts establish that defendant was engaged in the perpetration of aggravated burglary. Defendant committed a battery, the shooting of the Frosts, in the course of gaining unauthorized entry to the Frosts' house with the intent to commit theft. R.S. 14:60. In addition, defendant was armed with a dangerous weapon, a .22 caliber firearm. R.S. 14:60(1). The facts also satisfy the elements of armed robbery. Defendant took items of value from the person or from the immediate control of the Frosts by use of force while armed with a dangerous weapon. R.S. 14:64. All of the elements of simple robbery are contained in the crime of armed robbery, and so the evidence establishes that defendant was engaged in the perpetration of simple robbery. Finally, the facts show that defendant knowingly created a risk of death to more than one person. The defendant killed, or intentionally participated in the killing of, two persons in a single consecutive course of conduct. State v. Wingo, 457 So.2d 1159, 1169 (La.1984); State v. Glass, 455 So.2d 659, 669 (La.1984); State v. Sonnier, 402 So.2d 650, 658 (La.1981).
C. Proportionality
The sentence of death imposed in this case is not disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. The facts of the crime have already been discussed. With respect to the defendant, the record shows that at the time of sentencing Ronnie Burrell was thirty-two years old and divorced, with a six year old son. Defendant had custody of his child prior to his arrest for first degree murder. He did not return to school after completing the seventh grade. His only conviction for a violent crime was for simple battery in 1983. Defendant pleaded not guilty by reason of insanity to charges of simple burglary and aggravated arson in 1976, and was committed to Central Louisiana State Hospital. There was no psychological examination in the present case, and there was no other evidence of defendant's mental condition. There was testimony that defendant was drunk on the night of the murder, but there was no evidence that at the time the crime was committed defendant's capacity to appreciate the criminality of his conduct was impaired.
Assignments of Error Nos. 33 and 41
Defendant claims that his death sentence is unconstitutional because it is cruel and unusual punishment and is grossly out of proportion to the severity of his offense. La. Const. art. I, § 20; U.S. Const. amends. 8 and 14. Defendant offers two arguments in support of his claim. First, defendant *712 argues that he was convicted based solely on circumstantial evidence without proof that every reasonable hypothesis of innocence was excluded. This argument was considered and rejected in the discussion of
Assignment of Error No. 27.
Second, defendant argues that his sentence is disproportionate to the sentences imposed in similar crimes in Union Parish. Prior to the present case, there had been only two convictions for first degree murder since 1976 in the judicial district in which defendant was tried. Both of these other convictions were in Union Parish. One of the convictions was of Michael Graham. Graham was sentenced to death, but he appealed his conviction and sentence. His case is currently on remand to the trial court for a decision on a motion for new trial. The other conviction was of Roger Daniel Bryan. State v. Bryan, 427 So.2d 1169 (La.1983). Bryan shot and killed a sheriff's deputy who was attempting to arrest him on bench warrants issued after Bryan's indictment for simple burglary and contributing to the delinquency of juveniles. Upon recommendation of the jury, Bryan was sentenced to life in prison. The circumstances in Bryan are significantly different from the present case. The deputy who was killed had pursued Bryan by breaking open a door of Bryan's house. Ronnie Burrell went to a house belonging to others and, with apparent premeditation, violated the security of their home by killing them. Bryan was also several years younger than Burrell, and Bryan's only prior conviction was for driving while intoxicated. The aggravating circumstance urged in Bryan, that the victim was a peace officer engaged in his lawful duties, is unrelated to the aggravating circumstances found in the sentencing of Ronnie Burrell. Bryan did not kill more than one person, and he did not kill during the commission of a separate crime.
A review of cases from other districts shows that defendant's death sentence is not disproportionate to sentences imposed in similar cases. The death penalty has been imposed where more than one victim has been killed, each with a single shot, during the perpetration of aggravated burglary and armed robbery. State v. Wingo, supra; State v. Glass, supra. The present crime was a cold blooded killing to obtain money. State v. Tassin, 536 So.2d 402, 417 (La.1988); State v. James, 431 So.2d 399, 407 (La.1983). Upon comparison to cases in the same judicial district and cases in other districts, the sentence of death imposed on defendant is not excessive.
For the reasons assigned, defendant's conviction and sentence are affirmed. Defendant's sentence to death is affirmed for all purposes except that this judgment shall not serve as a condition precedent to execution as provided by R.S. 15:567 until (a) defendant fails to petition the United States Supreme Court timely for certiorari, (b) that court denies his petition for certiorari, (c) having filed for and been denied certiorari defendant fails to petition the United States Supreme Court timely under their prevailing rules for applying for rehearing of denial of certiorari, or (d) that court denies his application for rehearing.