815 So.2d 166 (2002)
STATE of Louisiana
v.
Lionel E. LEWIS.
No. 01-KA-1084.
Court of Appeal of Louisiana, Fifth Circuit.
March 13, 2002.
*168 Paul D. Connick, District Attorney, Churita H. Hansell, Terry M. Boudreaux, Brad Burget, Assistant District Attorneys, Gretna, LA, for Appellee.
*169 Bertha M. Hillman, Thibodaux, LA, for Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, Jr., JAMES L. CANNELLA and MARION F. EDWARDS.
EDWARDS, Judge.
Defendant, Lionel Lewis, appeals his conviction for distribution of heroin. We affirm.
On November 18, 1999, Lionel Lewis was indicted by a Jefferson Parish Grand Jury for distributing heroin, a violation of LSA-R.S. 40:966(A). Following a plea of not guilty, trial was held. On July 11, 2000, a twelve-person jury found Lewis guilty as charged, and he was subsequently sentenced to life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence. (At the time the offense was committed, this was the mandatory sentence.) Immediately thereafter, Lewis orally moved for appeal, and followed with a written motion.
In 1999, Lewis was arrested for allegedly selling three foil packets totaling approximately one-half gram of heroin to Billy Lewis, an undercover Jefferson Parish police officer, on June 13, 1994. Deputy Lewis testified that, at the time of trial, he was a patrol deputy with the Jefferson Parish Sheriff's Office, but that in 1994, he was working as an undercover narcotics officer. According to Deputy Lewis, a confidential informant told him that he could introduce Deputy Lewis to a person who was selling heroin in Jefferson Parish so that Deputy Lewis could "possibly purchase" some heroin from this individual. On June 13, 1994, at approximately 12:00 p.m., the informant and Lewis arrived at Schwegmann's grocery store in the 2700 block of Airline Highway. The informant introduced defendant to Deputy Lewis, stating "Lionel, this is an old buddy of mine. He wants to talk to you." Thereafter, the informant departed the area. Deputy Lewis testified that defendant Lewis asked what he wanted, and Deputy Lewis replied, some "white dope." Defendant Lewis asked how much money he had, and Deputy Lewis said $100.00, which he gave to the defendant, who then left in a vehicle. About two hours later, defendant pulled alongside Deputy Lewis' vehicle and handed the heroin to Deputy Lewis. Later that day or the next day, Deputy Lewis paid the informant $100.00 for his involvement.
The transaction was observed by Detective Jolynn Cummings of the Jefferson Parish Sheriff's Office, who testified that she and another officer saw the defendant and Deputy Lewis meet and the defendant's return later that day. Detective Cummings admitted that she had read Deputy Lewis' report of the transaction before trial. Detective Cummings stated, however, that she had an independent recollection of the day's events after reading the police report of the event that occurred six years before trial. Both Deputy Lewis and Detective Cummings stated that the transaction was not recorded by video surveillance because the parking lot of Schwegmann's was not conducive to video recording.
In his testimony, defendant Lewis acknowledged convictions for theft and armed robbery in 1990, but emphatically denied that he sold heroin on June 13, 1994 or at any time in the past. Lewis testified that the confidential informant was Norman Molaison, an individual whom Lewis had first met at the restaurant where Lewis was employed. Lewis testified that a few days before June 13, 1994, he encountered Molaison at a convenience store where they struck up a conversation. Lewis told Molaison he was about to start *170 working offshore, and Molaison expressed an interest in doing the same. According to Lewis, they exchanged telephone numbers so that Molaison could contact defendant about working together offshore.
On June 13, 1994, Molaison telephoned Lewis from a hotel near Schwegmann's to say that his car was not working and asked defendant to "help him out." On the way to the hotel, Lewis stopped to pick up a friend, Gary Berone, who subsequently died in 1995. When they arrived at the hotel, Berone inspected Molaison's car and determined that the car needed a new alternator. Molaison then asked Lewis to bring him to his sister's house so that he could borrow some money for a new alternator. Lewis agreed. On the way, however, Molaison requested that Lewis stop at an Amoco gas station because Molaison needed to see his "friend Billy." While at the gas station, Lewis and Berone purchased soft drinks. Lewis said he lost sight of Molaison when they arrived at the gas station. When Molaison returned to the car, Lewis drove to an area on the "back side of the French Quarter" in New Orleans, and parked the car. Molaison went into a house and was gone for about fifteen to twenty minutes. Lewis resumed driving and headed toward the Allstate Auto Parts near Airline Highway and Clearview Parkway.
As they neared the auto parts store, Molaison said he wanted to stop at Schwegmann's to get some cigarettes, and they could all get soft drinks. After they made their purchases, the trio returned to the vehicle. Molaison then reached into his pocket and produced three foil packets saying "Here, there's Billy. Go give this to Billy for me." Lewis said that he initially refused, but ultimately complied because Molaison said, "Look, damn it, just go give it to Billy for me before I break your face." Defendant Lewis said he walked over to Deputy Lewis and said, "Here, Norman said to give you this," and then returned to the car.
Unnerved by Molaison's behavior, Lewis decided to return Molaison to the hotel instead of taking him to the car parts store. When Molaison realized Lewis's intentions, a heated argument ensued. At the hotel, Molaison leaped out of the car, ran around to the driver's side, and began punching Lewis in the face through the car's open window. According to Lewis, Molaison repeatedly shouted that he would kill him while punching him over and over again. After the fight subsided, Lewis drove Berone home, and returned to his own home in Harahan.
A few days later, Lewis went to his sister's house in Houma. At his sister's insistence, he went to the hospital where he was initially told he had facial bruises. However, on June 22, 1994, a Terrebonne Parish Sheriff's Officer showed up at his sister's house and told him that he needed to return to the hospital. X-rays had revealed Lewis had a broken jaw that required immediate surgery. Copies of Lewis's medical records were introduced into evidence at trial.
Deputy Lewis testified that attempts to get in touch with the defendant to arrange another deal were unsuccessful. When Deputy Lewis felt that another purchase would not be forthcoming, he prepared an arrest warrant for the defendant in November of 1995.
The defendant testified that he had been offered a deal to plead guilty to simple possession of heroin, but had refused it because he was not guilty. During Lewis's testimony, the informant was apparently brought into court in shackles, where Lewis identified him in front of the jury as the person who asked him to "hand something to Billy." After hearing the testimony and considering the evidence, ten out of twelve *171 of the jurors concluded that Lewis was guilty as charged.
In his first assignment of error, Lewis contends that the trial court improperly denied him the right to present a defense of entrapment.
A criminal defendant's right to present a defense is guaranteed by the Sixth Amendment of the United States Constitution and Article I, Section 16 of the Louisiana Constitution (1974).[1]
The entrapment defense has been explained as follows:
An entrapment is perpetrated when a law enforcement official or a person acting in cooperation with such an official for the purpose of obtaining evidence of the commission of an offense solicits, encourages, or otherwise induces another person to engage in conduct constituting such offense when he is not then otherwise disposed to do so. When entrapment is at issue, the focal point of the inquiry is on the predisposition of the defendant to commit the crime at issue as well as on the conduct of the police. For entrapment to exist, a defendant must be induced in some way to engage in criminal conduct which he otherwise would not be disposed to engage in. An entrapment defense will not lie if the officers or agents have merely furnished a defendant who is predisposed to commit the crime the opportunities to do so.[2]
The entrapment defense is composed of two elements: 1) an inducement by a state agent to commit an offense, and 2) lack of predisposition to commit the offense on the part of the defendant.[3] The burden of proof is on the defendant to raise the defense of entrapment and produce a preponderance of evidence that a state agent induced him to commit a crime. Once the defendant meets this burden, the state has the burden of proving beyond a reasonable doubt that the defendant was predisposed to commit the crime prior to government involvement.
Well in advance of trial, the defense disclosed its intent to use the defense of entrapment in this case. Specifically, in pre-trial hearings the defense sought to establish that the confidential informant had furnished the heroin to Lewis, threatened defendant with bodily harm if he failed to hand the heroin to the officer, and then was paid by the State for setting up the transaction. In the context of a hearing on a motion to reveal the confidential informant's identity on February 3, 2000, several months before trial, the defense sought to establish that the confidential informant was corrupt on the basis that he had furnished narcotics to be sold to undercover agents in previous cases.
At this hearing, the defense submitted a copy of the bill of information in case number 94-5484, which charged the defendant with two counts of distribution of hydrocodone on June 6, 1994, just a few days before the instant transaction. (Hydrocodone is regulated as a Schedule II Controlled Dangerous Substance and is an ingredient in the prescription medication Vicodin. See LSA-R.S. 40:967(A).) That *172 bill of information indicates these charges were dismissed on December 11, 1995, approximately one year after the arrest warrant for the defendant was issued in the instant case. The defense also submitted a document from a pharmacy indicating that a Melissa Seruntine, whom the defense contended was the confidential informant's girlfriend, had purchased "generic vicodin" on June 6, 1994. The document also indicated, inter alia, that between May 5, 1994 and August 12, 1994, Seruntine had also made eight purchases of generic Vicodin and two purchases of "hydrocodone bitratrate."
The defense questioned Vincent Paciera, the assistant district attorney assigned to Division "S," where the case had been pending. Mr. Paciera stated he did not recall the circumstances surrounding the dismissal of the hydrocodone charges against Lewis. Mr. Paciera acknowledged that a case in the division would not have been dismissed without his approval but stated that it was not his signature on the bill of information. The defense theorized that the charges had been dismissed when the District Attorney's Office had been confronted with this document, which the defense surmised indicated that the girlfriend and/or the informant were actually the suppliers of the pills in the undercover transactions. The police report of the June 6, 1994 transactions are in the record. These documents are attached to a letter sent from defense counsel to the District Attorney's Office in which the above defense theory is outlined. Various other documents are attached to the letter, including a bill of information charging Norman P. Melancon (referred to in the record as Molaison, the informant in this case) and Melissa Seruntine with theft of goods valued at over $500.00 and possession of a stolen vehicle, as well as four bills of information charging Melancon/Molaison with an assortment of offenses, including several counts of theft of goods and simple battery. Although the court ultimately ruled that the defense was not entitled to have the identity of the informant revealed, the court noted for the record that the defense knew the alleged informant's identity and, therefore, could subpoena the informant for trial.
On March 22, 2000, the State made an oral "Motion in Limine precluding the use of an entrapment defense" on the basis that there had been no showing that the confidential informant supplied the heroin in this case, and that even if the defense could prove that, there had been no showing that the State was aware of the confidential informant's actions in this regard. The State argued that absent evidence that the State had condoned the confidential informant's supplying the drugs, no evidence should be introduced regarding entrapment. The defense responded that it was not necessary to show that the State had actual knowledge of the confidential informant's actions, but that it was sufficient the confidential informant was an agent of the State. Judge Rothschild then ruled as follows:
I told counsel in hearing that I was going to deny the request for an entrapment instruction and/or defense until and unless you showed me that the agency situation, the acting for or on behalf of law enforcement had been shown. And I also told you thatthat [sic] not necessarily mean that the agent of that the law enforcement office had actual knowledgesits down and says, "yes sir, you go do this. You go set him up. You do this." And pat him on the back. Can't stick your head in the sand either. If there is a history of this and the officer knows that and he still lets him go act for him, then that could very well be an agency situation andit could be that law enforcement would be entrapping. *173 And you could have maybe gotten that in. But I told you that you would have to show me that. And if you had shown me that then I would certainly rule on the entrapment defense. And that's when we discussed the predisposition and all the rest of that. So, yes, I was going to deny the entrapment defense at this time and any referral to the entrapment unless and until it had been shown to me that the officer either knew or shown have known that the man was acting outside of the agency or acting in such a way as counsel for the defense had told me he was.
In the above ruling, the court did not foreclose the possibility of the entrapment defense, but instead, recognized that the defense could avail itself of the entrapment defense once evidence to justify the defense and/or a jury instruction was presented at trial. This ruling of the trial court did not deny the defendant the right to present his defense of entrapment.
Lewis next complains that his right to present a defense was abridged when the trial judge refused to permit the defendant to raise entrapment in closing argument. LSA-C.Cr.P. art. 774 restricts the scope of argument to "evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom and to the law applicable to the case." The trial judge has much discretion in controlling the duration and limiting the scope of closing arguments.[4] Nevertheless, defense counsel should be allowed a wide latitude in closing argument, and any undue restriction that limits argument to the prejudice of the defense is error. Where the prejudice is substantial, reversal is warranted.[5]
Before closing argument, the trial judge ruled that Lewis was not entitled to an entrapment jury instruction. The ruling resulted after defense counsel stated in closing argument that Deputy Lewis had testified that he did not know who had packaged the heroin or whether the informant had given the heroin to the defendant. After defense counsel surmised that Deputy Lewis had no knowledge as to whether defendant was guilty or not, the State objected. At this juncture we note that the judge who heard the pre-trial motions had voluntarily recused himself from the case, and the trial was heard in a different court.
Lewis produced no evidence at trial in support of his argument that he was entrapped other than his own testimony. The medical records did not prove inducement one way or the other, and, even under Lewis's version of the events, the fact is that the injuries occurred despite his compliance with the informant's requests, thus limiting the records' evidentiary value. Because there was some evidence in the form of Lewis's testimony relative to entrapment, it was error for the court to refuse to permit him to raise the defense in closing argument. However, we do not find substantial prejudice or that his right to present a defense was abridged, since the jury had the benefit of his testimony on this issue.
In his next assignment of error, Lewis claims that the trial court erred in refusing to charge the jury on the law of entrapment. Under LSA-C.Cr.P. art. 807, a requested special charge shall be given by the court if it does not require qualification, *174 limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given. A requested jury charge must be supported by the evidence.[6] The question whether the defendant had the requisite intent to commit the crime, or whether the police had implanted in the mind of an innocent person the disposition to commit the alleged offense and to induce its commission in order that they may prosecute is a question of fact to be decided by the jury.[7] In the present case, there is some evidence, i.e. the testimony of Lewis, which if believed by the jury, could support an entrapment defense. (This testimony was not offered at the earlier pre-trial hearing in which the court left open the possibility of an entrapment defense.) Under these circumstances, the trial judge improperly refused to instruct the jury on the entrapment defense.
However, this Court has recognized that the failure to read a special jury charge constitutes reversible error only when there is prejudice to the substantial rights of the defendant or the violation of some constitutional or statutory right.[8] In the present case, the trial judge did instruct the jury on the defense of justification as follows:
The defendant's conduct, otherwise criminal, is justified if the offense charged was committed through the compulsion of threats by another of death or great bodily harm and the defendant reasonably believed the person making the threat was present and would carry out the threats immediately if the defendant did not commit the crime.
Thus, if you find, one, that the defendant committed the offense charged because he was compelled by threats of death or great bodily harm, and two, that the defendant reasonably believed the person making the threats was present and would carry out the threats immediately if the defendant did not commit the crime, then you must find the defendant not guilty.
The defendant of compulsion is an affirmative defense, which the defendant must prove by a preponderance of the evidence.
In returning the guilty verdict, the jury obviously did not believe that Lewis had transferred the heroin because he had been threatened by Molaison. Because this was the same and only evidence offered by the defense on the entrapment issue, the absence of an entrapment jury instruction ultimately did not result in prejudice to Lewis.
In his third assignment of error, Lewis claims the trial court erred in granting the informant a blanket privilege against self-incrimination.
The Louisiana Supreme Court has held that a witness, as opposed to the defendant on trial, may assert the constitutional privilege against self-incrimination only on a question-by-question basis.[9] However, the Court has also recognized that a witness *175 may invoke "a blanket Fifth Amendment privilege ... when the witness is charged with participating in the same crime for which the defendant is being tried, and when it is apparent that the inquiry will be devoted to subject matter that would raise in the witness reasonable cause to apprehend danger from a direct answer or an explanation as to why one cannot be given."[10] Further, the Louisiana Supreme Court has held that it is impermissible to knowingly call a witness to the stand who will assert the Fifth Amendment privilege against self-incrimination.[11]
At a pre-trial hearing in the present case, the assistant district attorney brought to the trial court's attention the fact that the informant intended to invoke a Fifth Amendment privilege against self-incrimination. The assistant district attorney stated that he had an opportunity to "meet with Mr. Molaison to discuss what we thought was going to be the issue that was going to be raised by the defense," which the assistant district attorney said he believed related to the entrapment defense. A hearing was held outside of the presence of the jury to determine whether Molaison would testify or instead, invoke his privilege against self-incrimination. The defendant was questioned, in part, as follows:
Q. And did you inform me whether or not you wanted to admit your involvement in any particular crime or drug transaction that would subject you to criminal charges?
A. No, sir.
Q. What did youso you're saying you do want to talk about your involvement as far as any potential criminal charges or you don't want to talk about your involvement?
A. I don't.
. . . .
Q. Because I just want to clarify for the record. Maybe I'm not making myself clear as far as Fifth Amendment rights or not, but is it your wish to go up there and offer any type of incriminating evidence against yourself?
A. No, sir.
Q. And, therefore, is it your right to invoke any constitutional rights you have not to incriminate yourself?
A. No, sir.
Defense counsel also questioned Molaison, who said that he would answer the defense's questions truthfully, but that he barely remembered the events of June 1994. He admitted introducing Lewis to an agent, but when the defense asked if he had also "beat up" Lewis, the trial court sustained the State's objection. Molaison stated that he was currently facing criminal charges, but did not state the nature of the charges. He admitted to prior felony convictions including theft, burglary, and a "federal counterfeiting charge." Thereafter, the assistant district attorney told the court that perhaps "Mr. Molaison did not make his testimony as clear as possible," but that Molaison had stated at their meeting, that "he did not want to testify regarding the facts of this particular case... because it would, in fact, subject him to possible distribution of heroin charges."
After further argument, the trial judge ruled that he "was satisfied that Mr. Molaison will invoke his Fifth Amendment right" and it would be futile to place him *176 in front of the jury. The defense objected to the trial judge's ruling.
It is not necessary for a witness who is charged with the same crime or crimes related to the offense crime for which the defendant is being tried to assert the privilege on a question by question basis when it is apparent that the witness will be asked to testify only regarding matters that could be expected to require the invocation of the privilege.[12] Under certain circumstances, a defense witness is properly permitted to invoke a blanket Fifth Amendment privilege, even when he is not charged with any crimes arising out of the events forming the basis of the defendant's charged offense.[13] "No purpose is served by requiring the witness to invoke the privilege against self-incrimination on a question by question basis since `either an answer or an explanation of a refusal to answer could result in disclosures injurious to the witness.'"[14]
In the present case, the defense clearly sought to have the informant admit culpability in the offense for which Lewis was charged. Although the defense proffered no questions it would have asked Molaison, it seems clear from the record that the thrust of the defense's questions to Molaison was whether Molaison had furnished the heroin and whether Molaison had threatened the defendant to force him to give it to Deputy Lewis. If Molaison admitted doing so, his answer could have exposed him to criminal liability, and an explanation of a refusal to answer could also result in injurious disclosures. This assignment of error is without merit.
Lewis filed a motion to quash the indictment because of an unreasonable pre-indictment delay. After a hearing, the trial court denied the motion. Lewis filed a pro se brief arguing that the trial court erred in failing to quash the indictment because the prosecution was not timely instituted. He asserts that the trial judge should have granted the motion to quash because the delays in LSA-C.Cr.P. art. 578 had elapsed. That article provides that, in non-capital felony cases, no trial shall be commenced after two years from the date of the institution of the prosecution. Lewis seems to argue that the date the arrest warrant was issued in 1994 is the date prosecution was instituted.
However, the date of institution of prosecution is the date when the indictment is returned or the bill of information is filed.[15] In the present case, the indictment was returned on November 18, 1999. Lewis's trial commenced a few months later in July 2000. Accordingly, the defendant was tried within the delays provided by LSA-C.Cr.P. art. 578.
The applicable article on the time for commencing prosecution is LSA-C.Cr.P. art. 571, which provides that "[t]here is no time limitation upon the institution of prosecution for any crime for which the punishment may be death or life imprisonment." At the time of the instant offense on June 13, 1994 and when the *177 indictment was returned on November 18, 1999, distribution of heroin was punishable by life imprisonment. Therefore, prosecution was timely under LSA-C.Cr.P. art. 571, since there is no statutory time limitation for instituting prosecution for a crime punishable by life imprisonment.
However, a defendant's constitutional due process rights may be violated by a pre-indictment delay, even though the prosecution is within the statutory time limits.[16] The issue of a pre-indictment delay does not arise under the speedy trial provisions of the Louisiana or United States Constitutions, but under the fundamental rights to due process and a fair trial.[17] The proper approach in determining whether an accused has been denied due process of law through a pre-indictment or pre-arrest delay is to measure the government's justifications for the delay against the degree of prejudice suffered by the accused.[18]
In the present case, Lewis's primary assertion of prejudice is the 1995 death of Gary Berone, who allegedly witnessed the events of June 13, 1994. We do not find that Berone's death is attributable to the delay between the offense and the indictment because Berone died in the early part of the five and one-half-year delay, not the latter part.
The State provided little explanation for the five and one-half-year delay between the offense and the indictment. At the hearing, Deputy Lewis testified that the arrest warrant was signed on November 18, 1994, five months after the transaction. Deputy Lewis explained this delay was due to the fact that he had tried unsuccessfully to get in touch with defendant Lewis for a second sale. As for the time after the warrant had been issued, Deputy Lewis said his efforts to locate the defendant proved fruitless. The officer testified he had tried to locate the defendant at the defendant's previous addresses, but was told that the defendant had left town. Because Deputy Lewis transferred out of the Narcotics Division in January of 1996, he had no further contact with this case thereafter.
Defendant Lewis denied that he had tried to avoid apprehension, and in fact, he said he went to court in Jefferson Parish from September 1994 until December 1995, when the charges for distribution of hydrocodone (Vicodin) were dismissed. Deputy Lewis stated that he had no knowledge that defendant was in court for this offense, and that he did not "run" defendant's rap sheet to determine his location. Deputy Lewis further stated that even if he had checked the defendant's rap sheet, the computer might not have listed the arrest. On cross-examination, Deputy Lewis denied he had purposefully delayed obtaining the arrest warrant in order to gain a tactical advantage. He also stated that the State's case had not gained any advantage due to the delay between 1994 and the defendant's arrest in 1999.
Although the State's explanation for the delay was rather vague after the arrest warrant was issued in 1994, there is no indication that the State deliberately delayed to gain a tactical advantage over the defense. Further, Lewis does not even allege that the State delayed in order to obtain a tactical advantage. In his brief, he concedes that the State's delay was due to negligence on the part of the State. Additionally, Lewis has not demonstrated the actual prejudice contemplated by the above jurisprudence in order to establish a due process violation by the pre-indictment delay. We find that Lewis's due process *178 rights have not been violated by the pre-indictment delay. This assignment of error is without merit.
The record was reviewed for errors patent.[19] Both the commitment and the transcript reflect that the trial judge denied parole eligibility at sentencing. Lewis's sentence is illegal because LSA-R.S. 40:966(B)(1), as it existed when the offense was committed in 1994, does not provide for denial of parole eligibility.
According to LSA-C.Cr.P. art. 882(A), "[a]n illegal sentence may be corrected at any time by the court that imposed the sentence or by an appellate court on review." Therefore, we amend the sentence to delete the word "parole" and remand for the trial court to correct the minutes and commitment.[20]
For the foregoing reasons, the conviction is affirmed. The sentence is amended as stated above, and the matter is remanded to the trial court for correction in accordance with this opinion.
AFFIRMED; REMANDED.
NOTES
[1] Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); State v. Hamilton, 441 So.2d 1192, 1194 (La.1983); State v. Carter, 570 So.2d 234, 236 (La.App. 5 Cir. 1990).
[2] State v. Francis, 98-811 (La.App. 5 Cir. 1/26/99), 727 So.2d 1235, 1238, writ denied, 99-0671 (La.6/25/99), 746 So.2d 597, quoting State v. Sumlin, 617 So.2d 225 (La.App. 5 Cir.1993).
[3] State v. Hardy, 98-25 (La.App. 5 Cir. 5/13/98), 715 So.2d 466; State v. Francis, supra.
[4] State v. Washington, 614 So.2d 711, 713 (La.1993).
[5] State v. Burrell, 561 So.2d 692, 704 (La. 1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991).
[6] State v. Craig, 95-2499 (La.5/20/97), 699 So.2d 865, 869, cert. denied, 522 U.S. 935, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997).
[7] State v. Harrington, 332 So.2d 764 (La. 1976).
[8] See State v. Davis, 00-278 (La.App. 5 Cir. 8/29/00), 768 So.2d 201, 212, writ denied, 00-2730 (La.8/30/01), 795 So.2d 1205, and the cases cited therein.
[9] State v. Brown, 514 So.2d 99, 110-111 (La. 1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1754, 100 L.Ed.2d 216 (1988); State v. Wilson, 394 So.2d 254, 257-258 (La.1981).
[10] State v. Bright, 98-0398 (La.4/11/00), 776 So.2d 1134, 1156.
[11] See, State v. Haddad, 99-1272 (La.2/29/00), 767 So.2d 682, 686, cert. denied, 531 U.S. 1070, 121 S.Ct. 757, 148 L.Ed.2d 660 (2001) and the cases cited therein.
[12] See State v. Bright, 98-0398 (La.4/11/00), 776 So.2d 1134; see also State v. Gerard, (La.App. 5 Cir.11/14/96), 685 So.2d 253, 257-258.
[13] See State v. Smith, 573 So.2d 1233 (La. App. 4 Cir.1991), writ denied, 577 So.2d 48 (La.1991) and the cases cited therein.
[14] State v. Smith, supra citing State v. Brown, 514 So.2d 99, 110-111 (La.1987), cert. den., Brown v. Louisiana, 486 U.S. 1017, 108 S.Ct. 1754, 100 L.Ed.2d 216 (1988).
[15] State v. Gladden, 260 La. 735, 257 So.2d 388, 391 (1972), cert. denied, 410 U.S. 920, 93 S.Ct. 1377, 35 L.Ed.2d 581 (1973); State v. Watts, 99-57 (La.App. 5 Cir. 5/19/99), 738 So.2d 628.
[16] United States v. Lovasco, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971).
[17] State v. Schrader, 518 So.2d 1024, 1027 (La.1988); State v. Malvo, 357 So.2d 1084, 1085 (La.1978).
[18] State v. Malvo, supra.
[19] LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990).
[20] See State v. Yancy, 93-2798 (La.5/31/96), 673 So.2d 1018.