831 So.2d 320 (2002)
STATE of Louisiana
v.
Christopher SANBORN.
No. 02-KA-257.
Court of Appeal of Louisiana, Fifth Circuit.
October 16, 2002.
*322 Margaret S. Sollars, Thibodaux, LA, for Appellant, Christopher Sanborn.
Christopher E. Sanborn, Angola, LA, Appellant in Proper Person.
Harry J. Morel, Jr., District Attorney, Kim K. McElwee, Assistant District Attorney, Hahnville, LA, for Appellee, State of Louisiana.
Panel composed of Judges SOL GOTHARD, JAMES L. CANNELLA and THOMAS F. DALEY.
JAMES L. CANNELLA, Judge.
Defendant, Christopher Sanborn, appeals from his convictions of two counts of armed robbery and his concurrent sentences to 75 years in prison at hard labor, without benefit of parole, probation or suspension of sentence. For the reasons that follow, we affirm.
On August 11, 1999, the St. Charles Parish Grand Jury returned a true bill, charging the Defendant in count 1 of attempted second degree murder of John Carroll, in violation of La. R.S. 14:27, 30.1, and in count 2 of conspiracy to commit second degree murder of John Carroll, in violation of La. R.S. 14:26, 30.1. Danielle Kenner (Kenner), Marion Sanborn (Marion),[1] and Ty Collins (Collins) were charged as co-defendants. The Defendant was arraigned on August 19, 1999 and pled not guilty to both counts. The Defendant was arraigned a second time on September 16, 1999 and again pled not guilty.
On January 19, 2000, the State amended the bill of indictment to charge, in count 1, armed robbery of John Carroll and in count 2, armed robbery of Mattie Holmes, both in violation of La. R.S. 14:64. The amendments applied to all of the defendants named in the indictment. On the same day, the State moved the trial court to sever the cases of Collins and the Defendant for separate trials, which was granted.
On July 25, 2000, the Defendant was arraigned on the amended charges and entered a plea of not guilty. The Defendant went to trial individually before a jury of twelve persons on July 25 and 26, 2000.
At trial, co-defendant Kenner testified for the State that, on the night of June 10, 1999, she met with the Defendant, Collins, her boyfriend, at the time of the offense, her then boyfriend, and Marion, the Defendant's cousin, at Marion's house in New Orleans. Kenner drove the group in her car to a Burger King restaurant on Airline Highway at Ormond Boulevard in Destrehan, Louisiana. Kenner testified that she had been employed there.
*323 The group arrived at the Burger King after it was closed for the night. The only two employees on the premises were Mattie Holmes (Holmes), the night porter, and John Carroll (Carroll), an assistant manager who had just completed his first day on the job. Kenner was familiar with Holmes' nightly work routine and knew when she would be exiting the restaurant to put trash in the dumpster. After waiting for a short time in the car, the Defendant and Collins exited and waited at the dumpster. She further testified that she gave the Defendant a blue bandanna. Kenner and Marion drove off. Kenner testified that she was aware that the Defendant and Collins planned to rob the Burger King and then flee the scene in the manager's car.
Marion testified that she also knew of the plan to rob Burger King. She attempted to talk the men out of it, but when they proceeded with the plan, she went along because she was concerned for her cousin's safety.
Marion went into a Winn-Dixie grocery to buy cigarettes and Kenner used a nearby pay telephone to call Holmes at the Burger King. She testified that her intention was to warn Holmes of the impending robbery, so that she would not be injured. Kenner did not, however, warn Holmes. Instead, she told Holmes that she intended to stop at the restaurant to pick up some pies that were left over after closing. She asked Holmes to meet her outside of the restaurant.
Holmes testified that she was surprised to receive a call from Kenner, but agreed to bring her two pies. She then went back to work. Holmes went out of the back door to put the trash in the dumpster. A man said, "This is a stickup." Assuming this was a prank, she asked, "Who in the hell is playing." The man responded, "You think I'm playing? You come see." Holmes moved into the light to find a man pointing a gun at her. A second man, his face covered with a blue bandanna, stood behind the gunman.
The men ordered Holmes to open the door. She told them that she could not. One of the men grabbed her and pushed her inside the restaurant. The men demanded that Holmes show them to the office and she complied. The man without the mask told her to remove her uniform shirt and she did so. The men then ordered Holmes to get on the floor in the cooler.
Carroll testified that at midnight he was in his office doing paperwork. The other restaurant employees, with the exception of Holmes, had departed at around 11:30 p.m. Carroll did not hear anyone enter his office, but saw a silver object, which he later realized was a revolver. He saw someone wearing a dark blue mask. He only described the man as dark skinned. He was hit in the head with the gun and sustained a wound that required 18 stitches.
The masked man pushed Carroll to the floor. The man shoved the gun against Carroll's head and said, "Open the fing safe." A second man entered the room, held a gun to Carroll's head and ordered him to open the safe. The second man then left the office. Carroll tried the combination, but had trouble opening the safe. The masked man continued to shove the gun at his head and neck, causing him to miscount. The assailant grew impatient and threatened to kill Carroll if he did not open the safe immediately. Carroll felt pressure on his left foot and later discovered that the masked man had broken his ankle by stepping on it. The masked man fired a shot at Carroll, wounding his right thigh.
*324 Despite his injuries, Carroll continued trying to open the safe. The second man entered the office again and rummaged through Carroll's pockets. He took Carroll's car keys, office keys and wallet. He then put his gun to Carroll's head and again demanded that he open the safe. Carroll responded that he was not certain he was using the correct combination and that the combination numbers were written on a piece of paper in his wallet. The second man threw the wallet to Carroll, who checked the combination and determined that he had been using the correct numbers. The second man continued to point his gun at various parts of Carroll's body and finally shot Carroll in the hip.
Carroll eventually opened the safe. The men ordered Carroll to move away from it and Carroll crawled out of the office. He heard the men rummaging through the safe. They found a roll of duct tape in Carroll's office and directed Holmes to bind Carroll's legs with it. Then, they decided against that, and instead had Holmes and Carroll lie on the floor. They disconnected the office telephone. Before leaving the building, they ordered Carroll and Holmes to go into the cooler. Carroll, unable to walk, crawled there. He testified that the men took $1,300, but left $3,000 behind on his desk.
Marion testified that she and Kenner were concerned about whether the Defendant and Collins had gotten away from the restaurant safely, so they drove back to investigate. They saw the Defendant and Collins walking and stopped to pick them up. The men said that they had shot the manager of the Burger King. Marion said she did not believe them and they responded that they did not shoot the manager, but were "just playing." Kenner testified that the Defendant said that he and Collins had each shot the manager once.
The group rode back to New Orleans in Kenner's car. Marion testified that both the Defendant and Collins were carrying guns. They stopped at Collins' house, where the men gave each woman $225. Kenner testified that they all went to a bar and then to a truck stop casino in the Michoud area of New Orleans.
Meanwhile, at the Burger King, Holmes and Carroll made their way to the nearby Winn-Dixie grocery and had someone there call police. Detective Sergeant Rodney Madere of the St. Charles Parish Sheriff's Office arrived at the scene, interviewed Holmes, who was outside of the Burger King, then inspected the inside with crime scene technician Michael Jackson.
Detective Madere testified that he saw the manager's car, a white Saturn, outside of the Burger King. The keys were in the ignition, both front doors were slightly ajar, and the windshield wipers were moving. There were three rolls of quarters on the seat. Lieutenant Pink Duckworth, a canine officer and his dog discovered a trail of evidence starting near the Burger King and leading in the direction of New Sarpy. The items found included currency, a pair of gloves, a blue bandanna, and a Burger King uniform shirt.
Detective Madere took Holmes to the Detective Bureau and had her look at "mug shots." She was able to give a description of the man who was not wearing the mask, but did not find a photograph of him in the book. Holmes told Detective Madere she had never seen either of the perpetrators prior to that night. At trial, however, Holmes testified that she had previously seen one of the perpetrators at the Burger King with Kenner. Carroll did not identify either of the perpetrators.
Detective Madere testified that he was called out of town the day after the robberies and that three other detectives continued *325 the investigation. Detective Robert Lynch received a telephone call from a Burger King employee who said that Holmes had not told investigators all she knew about the robbery. Detective Lynch questioned Holmes, who told him about the call which she had received from Kenner just before the robberies. Detective Lynch interviewed Kenner on June 18, 1999, at which time she implicated the Defendant in the robberies. Detective Lynch obtained an arrest warrant for the Defendant and, with the help of the New Orleans Police Department, arrested him at his home in New Orleans.
Detective Madere further testified that Kenner went to Florida following the robberies. When police investigators learned of her return, she was questioned again. On August 9, 1999, she admitted to her own involvement in the robberies, and named Collins and Marion as participants. Kenner was placed under arrest along with Collins and Marion. Marion gave a statement to police on August 13, 1999.
Following trial on July 25 and 26, 2000, the jury returned verdicts of guilty as charged on both counts. On August 7, 2000, the Defendant filed a Motion for New Trial and a Motion for Judgment of Acquittal. The trial judge denied both motions on August 8, 2000. On August 15, 2000, the trial judge sentenced the Defendant on each count to 75 years imprisonment at hard labor, without benefit of parole, probation or suspension of sentence, to run concurrently with each other.
The Defendant filed a Motion to Reconsider Sentence and a Motion for Appeal on August 18, 2000. On August 24, 2000, the trial court granted the appeal and denied the Motion to Reconsider Sentence.
On November 10, 2000, the Defendant filed a second Motion for New Trial, alleging the discovery of new evidence. The trial court ruled, "Jurisdiction of Trial Court has divested pursuant to La.C.Cr.P. article 916. This court cannot act on this request." On November 20, 2000, this Court issued an Order remanding the case to the trial court for a hearing and ruling on the Defendant's second new trial motion. On December 12, 2000, the trial court heard arguments on the Motion for New Trial and denied it. The appellate record was subsequently re-lodged here.
On May 23, 2002, the Defendant filed in this Court a Motion to File Pro se Supplemental Brief. On June 6, 2002, the Defendant filed a supplemental brief, alleging one assignment of error. On June 14, 2002, the motion to supplement was ruled moot, since the Defendant had by that time already filed his pro se brief. On appeal, through counsel and pro se, the Defendant assigned four errors.

ASSIGNMENT OF ERROR NUMBER ONE
In this assignment of error, the Defendant argues that the State failed to prove his identity as one of the perpetrators, beyond a reasonable doubt. The Defendant asserts that the State's case was based on tenuous circumstantial evidence and on unreliable witnesses whose testimony conflicted.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. State v. Juluke, 98-0341 (La.1/8/99), 725 So.2d 1291; State v. Williams, 99-223 (La.App. 5th Cir.6/30/99), 742 So.2d 604.
Circumstantial evidence consists of proof of collateral facts and circumstances *326 from which the existence of the main fact may be inferred according to reason and common experience. State v. Williams, supra. When circumstantial evidence is used to prove a case, the trial judge must instruct the jury that, "in order to convict, it [the evidence] must exclude every reasonable hypothesis of innocence." La. R.S. 15:438.
Armed robbery is defined as "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." La. R.S. 14:64. Encompassed in proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. When identification is the key issue in the case, the state is required to negate any reasonable probability of misidentification in order to carry its burden. State v. Anderson, 01-789, p. 6 (La.App. 5th Cir.1/15/02), 807 So.2d 956, 960.
The trial testimony of Kenner, Marion and the two victims, Carroll and Holmes, established that all of the elements of La. R.S. 14:64 were met for both counts of armed robbery.
Kenner and Marion positively identified the Defendant at trial as one of the two robbers. They testified that they rode with the Defendant and Collins to the Burger King, that they knew beforehand of their plan to rob the restaurant, that they dropped the men off near the dumpster behind the building and left the area when they heard a woman (presumably Holmes) scream. Kenner testified that she gave the Defendant a blue scarf before the robberies. Kenner and Marion both testified that they returned to the area to find the Defendant and Collins walking in the vicinity of the Burger King and that the Defendant and Collins told them that they were unable to use the manager's car to escape because it had a standard transmission. They testified that the Defendant and Collins said they had shot the manager of the Burger King, and then said that they were "just playing." Marion saw the Defendant and Collins holding guns while they were all riding in the car following the robberies. Kenner and Marion described how the two men divided the money which they had taken from the Burger King. Kenner testified at trial that she was now telling the truth because "it is eating at my conscience. I had never been involved in nothing like this."
Holmes and Carroll testified that one of the perpetrators wore a blue scarf or bandanna on his face. Deputy Jackson testified that he found a blue bandanna on the ground outside of the Burger King. They both identified the bandanna as the one worn by one of the perpetrators. Holmes testified that she thought she recognized the robber wearing the mask as Kenner's boyfriend because of the top of his head.
The truthfulness of the witnesses goes to their credibility. The credibility of a witness is within the sound discretion of the trier of fact. It is not the function of the appellate court to assess credibility or re-weigh the evidence. State v. Temple, 01-655, p. 8 (La.App. 5th Cir.12/12/01), 806 So.2d 697, 704. The jury obviously gave credence to the testimony of Kenner and Marion, despite the discrepancies in their stories and their admission to lying to the police at an earlier time. Based on the foregoing, we find that the evidence was sufficient to prove identity under the Jackson standard. This assignment of error has no merit.

ASSIGNMENT OF ERROR NUMBER TWO
In this assignment of error, the Defendant argues that he was prejudiced by the *327 trial court allowing the State to amend the bill of indictment on the day of trial. The State counters that the indictment was amended months before the trial and the Defendant had ample time to prepare his defense to the amended charges. It was merely a technicality that the district attorney had neglected to sign the amendment until the morning of trial.
On January 19, 2000, the district attorney amended the indictment by stating, "But Judge, for the Record, I want to amend in open court the Indictment. Count 1, I'm amending from attempted second-degree murder to armed robbery of John Carroll. Count 2, I'm amending from conspiracy to commit second degree murder on John Carroll, I'm amending that to armed robbery on Mattie Holmes."
On July 25, 2000, shortly before the trial began, the trial judge noted that the district attorney had not signed the amendment to the bill of indictment. The district attorney signed and dated the amendment, pointing out that the Defendant had already been arraigned on the amended bill. He further stated:
And for the record, if it's not clear, the Bill is amended to two counts of armed robbery of John Carroll and Mattie Holmes. I'm looking at the language, and I did not cross out "did attempt to commit," and "did conspire to commit," but there's no question that the charges are armed robbery, not attempt. I'm scratching that out now so nobody will read it. "Did conspire to commit," those are not what we're going with. We're going with two counts of armed robbery of those two victims.
Defense counsel objected "to these changes made at this stage of the proceedings." When the trial court asked her to explain the reason for her objection, she stated, "My understanding was that the charges have been amended to attempted armed robbery of Mattie Holmes and conspired to commit armed robbery of John Carroll. If those elements are the same, then I would just like to object for the Record." The State responded, "They're not." Defense counsel then stated, "They're not. Then I think that's an unfair surprise."
The following exchange ensued:
The Court:
Tell me how your defense is different before than now?
Ms. Williams [defense counsel]:
Well, first of all, if he's being charged with attempt, then he's looking at, on a conviction, half the sentence that he would get. You know, essentially my client is exposed to a greater sentence now than if the charge is not attempted armed robbery. It's armed robbery.
The Court:
Okay, that's true. But I'm trying to determine if this changes your defense strategy at trial.
Ms. Williams:
I would just have to adjust my opening statement. I don't thinksuppose it's too big of a hardship.
The Court:
Okay. Do you want a formal reading of the charges? It's one charge?
Ms. McElwee:
It's two charges, two counts.
The Court:
Two charges.
Ms. Williams:
Your Honor, we waive the formal reading of the formal charges, tender a plea of not guilty to all charges.
The Court:
All right. Enter his not guilty pleas.
Ms. McElwee:

*328 And Judge, I'm sure it will be clear on the Record if we go back and look at it, that we never talked about an attempt or a conspiracy of armed robbery, because it was a completed crime. The only thing, it was an attempt was, is because the man didn't die. It was attempted murder and conspiracy to commit that. Obviously the armed robbery was completed, so there was never any question between the parties that we were going to trial on a completed crime of two counts.
The Court:
All right.
Ms. McElwee:
It was not 14:27,64. It's 14:64.
The Court:
I see. The numbering's scratched out, just the words, okay.
All right. I've reviewed the Indictment and the co-defendant's record, 99-0431, and it is clear to this Court that the District Attorney struck the language in Count 1 dealing with attempt, and it says, "amended to 14:64," which is armed robbery. In Count 2 she struck the statute number dealing with conspiring to commit. That's an armed robbery, and it's specifically worded to, "amended to 14:64," amended on 1/19/2000.
Accordingly, the Court finds no prejudice to the Defense; however, Defense will proceed.
Louisiana Code of Criminal Procedure, article 464 provides:
The indictment shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged. It shall state for each count the official or customary citation of the statute which the defendant is alleged to have violated. Error in the citation or its omission shall not be ground for dismissal of the indictment or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice.
The district attorney has the power and authority to amend grand jury indictments, as to both form and substance. State v. Neslo, 433 So.2d 73, 81 (La.1983); State v. Hayes, 98-485, p. 9 (La.App. 5th Cir.11/25/98), 726 So.2d 39, 43, writ denied, 99-0055 (La.5/7/99), 741 So.2d 29. Where the defense can show prejudice as a result of the amendment, the trial court may grant a continuance. State v. Neslo, 433 So.2d at 81.
Here, the Defendant does not show how he was prejudiced by the State's failure to completely amend the charges until just prior to trial. The original amendment, made on January 19, 2000, designated the statute (R.S. 14:64) under which he would be tried. Moreover, the State clearly stated on the record that day that the Defendant's charges were both being amended to armed robbery.
Although defense counsel argued prior to trial that the elimination of the superfluous language in the bill would affect her trial strategy, she thereafter stated that she was only changing her opening statement. The proper remedy, had the Defendant shown prejudice, would have been for him to request a continuance to allow him additional time to prepare the case. However, counsel did not move for a continuance. In fact, she effectively acquiesced in the trial court's ruling by agreeing to an arraignment as to the amended bill and offering a plea on the Defendant's behalf. Therefore, we find no prejudice to the Defendant by the amendment to the indictment This assignment of error has no merit.

*329 ASSIGNMENT OF ERROR NUMBER THREE

In this assignment of error, the Defendant argues that the trial court erred by rejecting his proposed special jury charge regarding the testimony of accomplices. The State responds that the requested jury charge was not applicable to the facts of the case and therefore the trial court was not required to give it.
Under La.C.Cr.P. art. 807, a requested special jury charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given. A requested jury charge must be supported by the evidence. State v. Lewis, 01-1084 (La.App. 5th Cir.3/13/02), 815 So.2d 166. The failure to read a requested special jury charge constitutes reversible error only when there is prejudice to the substantial rights of the defendant or the violation of some constitutional or statutory right. State v. Davis, 00-278, p. 14 (La.App. 5th Cir.8/29/00), 768 So.2d 201, 211.
Defendant submitted the following charge in writing at the conclusion of trial:
An accomplice is one who is associated with another in the commission of a crime. While you may convict on the uncorroborated testimony of an accomplice, you should act upon such testimony with great caution, subject to a careful examination in the light of the other evidence in the case, and you are not to convict upon such testimony alone, unless satisfied, after a careful examination of its truth, and also that you can safely rely on it. State v. Hamilton, 312 So.2d 656 (La.1975).
The State objected to the charge, arguing, "Judge, I'm not objecting to the validity of the charge in the proper case, but I don't think it fits our case." The trial judge responded, "Well, in this particular case the accomplice's testimony was corroborated in this Court's opinion, so some of this language would not be appropriate." After considering the matter, the trial court denied the Defendant's request, stating,
The Court finds that there is ample cooperation [sic] of the accomplice's testimony in this case, specifically the two accomplices corroborate each other's testimony. There is physical evidence dealing with the actual gunshot wounds and the fact that the robbery did take place. So I'm not going to give that instruction.
The Defendant objected to the trial court's ruling.
In support of his decision, the trial judge cited State v. Howard, 98-0064 (La.4/23/99), 751 So.2d 783, cert. denied, 528 U.S. 974, 120 S.Ct. 420, 145 L.Ed.2d 328 (1999), a capital murder case, in which the defendant challenged the trial court's failure to give a special jury charge regarding how to judge the credibility of expert witness' opinions as they relate to the factual bases of such opinions in either the guilt phase or the penalty phase of trial. The Louisiana Supreme Court first noted that the defendant had failed to preserve the issue for appeal, since trial counsel had failed to submit a request for a special instruction as provided by Article 807. The Supreme Court further found that a special charge was not required on that point, since the trial court covered the substance of the requested instruction in its general charge on weighing the credibility of witnesses. Howard, 98-0064 at pp. 19-20, 751 So.2d at 805-806.
Similarly, the trial court's ruling in this case is supported by the record. The evidence at trial corroborated Kenner's and *330 Marion's testimony so that the requested charge was not applicable. Moreover, as was the case in Howard, the requested charge was covered in the trial court's general charge. The trial court charged the jury, in part, as follows:
As the sole judge of the credibility of witnesses and of the weight their testimony deserves, you should scrutinize carefully the testimony given and the circumstances under which the witnesses testified. In evaluating the testimony of a witness, you may consider their ability and opportunity to observe and remember the matter about which they testified, their manner while testifying, any reason they may have for testifying in favor or against the State or Defendant, and the extent to which the testimony is supported or contradicted by other evidence.
Based on the foregoing, we find no error in the trial court ruling refusing to give the Defendant's requested special jury charge. This assignment of error has no merit.

ASSIGNMENT OF ERROR NUMBER FOUR

PRO SE ASSIGNMENT OF ERROR
In these assignments of error, the Defendant argues that his concurrent sentences of 75 years on each count are excessive, considering his youth, and being a first time felony offender.
The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. State v. Lobato, 603 So.2d 739, 751 (1992); State v. Munoz, 575 So.2d 848, 851 (La.App. 5th Cir.1991), writ denied, 577 So.2d 1009 (La.1991). Even a sentence which falls within statutory limits may be excessive under certain circumstances. State v. Robicheaux, 412 So.2d 1313, 1319 (La.1982); State v. Short, 00-866, p. 12 (La.App. 5th Cir.10/18/00), 769 So.2d 823, 831, writ denied, 00-3271 (La.8/24/01), 795 So.2d 336.
A reviewing court will not set aside a sentence as excessive if the record supports the sentence imposed. La. C.Cr.P. art. 881.4(D); State v. McCorkle, 97-966, p. 14 (La.App. 5th Cir.2/25/98), 708 So.2d 1212, 1219. Factors the court may consider in reviewing the sentencing judge's discretion are: 1) the nature of the crime, 2) the nature and background of the offender, and 3) the sentence imposed for similar crimes by the same court and other courts. State v. Ulmer, 99-1079, p. 4 (La. App. 5th Cir.1/25/00), 751 So.2d 1017, 1019.
The sentencing range under La. R.S. 14:64(B), at the time of the commission of the offense, was five to 99 years, without benefit of parole, probation, or suspension of sentence.[2] The Defendant's sentence is near the upper end of that range, but well within statutory limits. The trial judge listed several aggravating factors which he considered in arriving at the sentence. He noted that he found no mitigating factors. In his reasons for sentencing, the trial judge stated, in part:
All right. I will consider the fact, and I was aware of the fact, that he is only age 25. I have no evidence before me that he has one child other than your argument; however, I will consider that. There's no evidence before me also of *331 the fact that he has any prior felony convictions and that this would be his first.
. . . .
Mr. Sanborn, this crime is one of the most brutal sadistic and vicious crimes that I have seen on my 3½ years on this bench. It is crystal clear to this Court that the particular victim in this case suffered, both victims in this case suffered, not only from the shock and horror of being the victims of an armed robbery and feeling the dread of not knowing whether they were going to live or die during this ordeal, I am convinced that at least one of these victims suffered permanent emotional trauma, and that's the person you shot. I cannot understand why it was necessary for you to pistol whip this victim, to stomp this victim's ankle breaking it, and to shoot this particular victim in the thigh, simply because you felt he was not opening that safe fast enough.... I therefore concluded that you did these particular acts because you are a violent person and out of sheer brutality and cruelty, and that seems to be the basic nature of your person.
Because this crime exhibited an excessive degree of brutality and vindictiveness and sheer mercilessness, I have concluded that you have no rehabilitative potential, and that I am concerned more with general deterrents and in discouraging other criminals in this community and this surrounding area from committing these types of crimes. I am also more concerned with incapacitating you, that is with isolating you from society so that you will never ever again hurt another innocent victim. Accordingly, I have fashioned a sentence based on these designs.
The trial judge's statement shows that he did take into account mitigating factors such as the Defendant's youth and lack of a prior criminal record. The trial judge clearly gave more weight to the excessive violence used against the victim in committing the offense.
The Defendant complains that the trial court did not order a pre-sentence investigation report in his case. However, a pre-sentence investigation is an aid to the trial court and is not a right of a defendant. It is discretionary with the trial court whether a pre-sentence investigation is ordered prior to sentencing and there is no mandate that it be ordered. La.C.Cr.P. art. 875; State v. Marino, 00-1131, pp. 10-11 (La.App. 4th Cir.6/27/01), 804 So.2d 47, 55. Id.
Defendant argues that his sentence far exceeds those imposed by other courts under similar circumstances. As the Defendant claims, a reading of jurisprudence under the armed robbery statute shows that sentences for offenders of the Defendant's age and background, in cases similar to the Defendant's, generally receive sentences of less than 75 years.
In State v. Lofton, 96-1429 (La.App. 1st Cir.3/27/97), 691 So.2d 1365, writ denied, 97-1124 (La.10/17/99), 701 So.2d 1331, the court held that a 50 year sentence imposed for a first felony offender convicted of armed robbery was not constitutionally excessive. In that case the defendant put a gun to the victim's head as a threat, discharged the gun at least twice while the victim fled, but did not shoot the victim.
In State v. Mitchell, 26,718 (La.App. 2nd Cir.12/7/94), 647 So.2d 423, the court upheld a 50 year sentence for a young offender who robbed a pizza restaurant at gunpoint and in the process shot a manager five times, then repeatedly stabbed her.
Also in, State v. Palmer, 00-0216 (La. App. 1st Cir.12/22/00), 775 So.2d 1231, writs denied, 01-0211 (La.1/11/02), 807 *332 So.2d 224, 01-1043 (La.1/11/02), 807 So.2d 229, the court upheld 65 year sentence for armed robbery, although the defendant was a first felony offender. In that case the defendant and a companion robbed a small grocery using guns. The defendant pointed his gun at a female customer's face and shot a male customer. He also threatened the store clerk with the gun.
The record in this case indicates that the Defendant brutalized his victims both physically and emotionally. Collins was struck in the head with the pistol, had his ankle broken and was shot twice. Holmes was forced to partially disrobe at gunpoint and ordered to lie down in the cooler with Collins. She was threatened at gunpoint while hearing two shots being fired in the room with Collins. Each victim had reason to believe that they were going to be killed. We find that the Defendant's actions herein were at least as serious as those of the defendant in Palmer, who received a 65 year sentence. Therefore, we find that there is ample support in the record for the sentence imposed. These assignments of error have no merit.

ERROR PATENT REVIEW
The record was reviewed for errors patent. La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5th Cir. 1990). The review reveals no errors patent on the face of the record.
Accordingly, based on the foregoing reasons, we affirm the Defendant's two convictions for armed robbery and his two concurrent sentences of 75 years imprisonment at hard labor, without benefit of parole, probation or suspension of sentence.
AFFIRMED.
NOTES
[1] Marion's first name is actually spelled "Marian" in the bill of indictment, but is spelled "Marion" throughout the trial transcript.
[2] It is noted that La. R.S. 14:64(B) was amended by 1999 La. Acts, No. 932 (effective July 9, 1999), increasing the sentencing range to ten to 99 years. The new sentencing range is not applicable to this case.